UNITED STATES, et al.

v.

OTTATI & GOSS, INC., et al.

No. C80–225–L.

United States District Court,
D. New Hampshire.

Dec. 9, 1985.

**1364**

Richard V. Wiebusch, U.S. Atty., Concord, N.H., William D. Evans, Jr., Land & Natural Resources Div., Sheila D. Jones, U.S. Dept. of Justice, Washington, D.C., E. Michael Thomas, Office of Regional Counsel, Philip R. Boxell, Asst. Regional Counsel—USEPA, Boston, Mass., for the U.S.

Robert P. Cheney, Asst. Atty. Gen., Concord, N.H., for the State of N.H. (intervenor).

Engel & Morse, Mark S. Gearreald, Exeter, N.H., for the Town of Kingston, N.H. and the Town of Kingston Bd. of Selectmen (intervenor).

Wadleigh, Starr, Peters, Dunn & Chiesa by Theodore Wadleigh, Manchester, N.H., Guterman, Horvitz, Rubin & Rudman by Stanley H. Rudman, Boston, Mass., for Great Lakes Container Corp.

Sumner F. Kalman, Plaistow, N.H., Bracken & Baram, by Thomas B. Bracken, Boston, Mass., for Senter Transportation Co., Concord Realty Trust, Bernard Senter and Sally Senter.

Copithorne & Copithorne, David M. Copithorne, Laconia, N.H., for Ottati & Goss, Inc., Louis Ottati, Wellington Goss.

Stark & Peltonen by Rodney L. Stark, Manchester, N.H., for K.J. Quinn Co.

Sheehan, Phinney, Bass & Green by Claudia C. Damon, Manchester, N.H., for Lewis Chemical Co.

Hamblett & Kerrigan by John V. Dwyer, Nashua, N.H., Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan by James Stewart, Roseland, N.J., for Solvents Recovery Service of New England.

Brown & Nixon by Stanley M. Brown, Manchester, N.H., Howard E. Post, Intern. Minerals & Chemical Corp., Northbrook, Ill., for Intern. Minerals & Chemical Corp.

McLane, Graf, Raulerson & Middleton by Bruce Felmly, Manchester, N.H., Goodwin, Procter & Hoar by Paul F. Ware, Jr., Boston, Mass., for Lilly Indus. Coatings, Inc.

Devine, Millimet, Stahl & Branch by Richard Nelson, Manchester, N.H., Bingham, Dana & Gould by Paul J. Lambert, Boston, Mass., for General Elec. Co.

## FINDINGS OF FACT AND RULINGS OF LAW

LOUGHLIN, District Judge.

The United States of America instituted suit on behalf of the Administrator of the United States Environmental Protection Agency (hereafter EPA) by complaint dated May 15, 1980.

This is a civil action instituted pursuant to Section 7003 of the Resource Conserva-

tion Recovery Act ("RCRA") 42 U.S.C. 6973.

This is also a civil action under Sections 301 and 309 of the Clean Water Act, 33 U.S.C. §§ 1311 and 1319 against defendant Great Lakes Container Corporation (hereafter GLC).

The original suit filed May 15, 1980 was against the following defendants.

Ottati & Goss, Inc., a corporation organized and existing under the laws of the State of New Hampshire.

Louis Ottati, Jr., president of Ottati & Goss, Inc.

Wellington Goss, vice-president of Ottati & Goss, Inc.

Senter Transportation Company, Inc., a Massachusetts corporation registered to do business in New Hampshire and the owner and lessor of the Ottati & Goss site at times relevant up to June 29, 1979. On that date, Senter Transportation Company, Inc. sold the site and assigned its interest in the lease to the Concord Realty Trust.

The Concord Realty Trust, a trust registered in the Rockingham County Registry of Deeds, Kingston, New Hampshire. The Concord Realty Trust is the owner and lessor of the Ottati & Goss site.

Sally E. Senter, a trustee of the Concord Realty Trust.

Richard A. French, an operator of the Ottati & Goss site.

French Processing, Inc., an operator of the Ottati & Goss site.

Great Lakes Container Corporation, a corporation organized and existing under the laws of the State of Michigan and having a branch barrel reconditioning plant at and doing business at the Great Lakes Container Corporation site at Rural Route 125, Hanverhill Road, Kingston, New Hampshire.

Subsequently, in October, 1980, the State of New Hampshire was allowed to intervene as a plaintiff. Then, in November, 1980 the Town of Kingston was also allowed to intervene as a plaintiff.

On December 2, 1980 the court made the following order on plaintiff's motion for preliminary injunction.

Pending hearing on the merits or further order of this court, defendants are ordered to cease storing and disposing of solid and hazardous waste at the Ottati & Goss site. Defendants shall not conduct any activities there without prior approval of EPA and the State, until such time as all solid and hazardous waste is removed from the site.

Defendants shall formulate a plan on or before January 6, 1981 relative to fencing, guarding the site area with security personnel, maintaining suitable firefighting equipment on site and in the event the defendants, individually severally or jointly are found liable, specifically set forth remedial measures.

Defendants shall formulate a plan for the removal of all solid and hazardous waste from the Ottati & Goss site, such plan to be submitted for approval to the EPA and the State of New Hampshire.

On January 20, 1981 the court granted summary judgment as to Sally Senter as an individual.

On August 13, 1982 third-party actions were brought against the following defendants: Solvents Recovery Service of New England, Inc. (SRS), General Electric (GE), Lewis Chemical Corporation and Lilly Chemical Products, Inc.

Solvents Recovery Service of New England, Inc. is a corporation organized under the laws of the State of Connecticut with a principal place of business in Southington, Connecticut.

General Electric is a corporation organized under the laws of the State of Delaware and germane to this case, having a place of business in Chelsea, Massachusetts.

Lewis Chemical Corporation is a corporation organized under the laws of the Commonwealth of Massachusetts, having a principal place of business in Hyde Park, Massachusetts.

Lilly Chemical Products, Inc. is a corporation organized under the laws of the State of Indiana and germane to this case, having a place of business in Templeton, Massachusetts.

On September 14, 1982 a third-party action was brought against International Minerals and Chemicals Corporation (IMC).

International Minerals and Chemical Corporation is a corporation organized under the laws of the State of New York with a principal place of business in Northbrook, Illinois.

The area involved in this location is located west of Route 125 in Kingston, New Hampshire. One parcel of land consists of approximately 28 acres and is owned by Senter Transportation Company which has leased approximately one acre to the Ottati & Goss corporation.

The court after hearing pre-view statements with the assistance of counsel took a view of the premises. The view also included terrain east of Route 125 which consisted of a wet, marshy area. A view can be considered as evidence. *Chouinard v. Shaw,* 99 N.H. 26, 104 A.2d 522 (1954). The view was taken while the premises were snow covered and material had been removed from certain areas.

While on the view the court saw and noted the area for the purposes of this litigation, i.e., two brooks given the sobriquet of the North and South Brooks. Also observed were buildings formerly used by the Great Lakes Container Corporation, various wells, a burst trailer, roadways, Hampton Electric Power Company lines, so-called lagoon area, contours of Route 125 on its easterly and westerly bounds, contiguous property lines, wooded areas, set areas, declivities, slopes, depressions and elevations brought to the court's attention. Additionally, there was a general overall view of the area as demonstrated by counsel.

Evidence was adduced during the trial that some 400 million years ago, this area of New Hampshire was part of a large basin of the sea into which a whole series of sands, silts, fine-grain materials, were deposited as sediments. After 30,000 to 40,000 feet of what became sandstones, sand and clays had accumulated, the beds were worked, folded and faulted over 150 million years into a very compact and very hard bedrock, called the Elliot Formation.

At a time 50,000 to 60,000 years ago, there was glacial ice two miles high over the area, with its weight pushing down on the bedrock; when the ice melted the pressure was released causing fractures and weaknesses, with erosion, and in those areas valleys developed.

At this time, there was a geological-climatological event that changed the surface of the area even more. This large ice sheet pushed down from Canada riding the top of the bedrock and scouring it, scooping it up, digging and depositing, and creating *till,* a very fine-grain material formed as a blanket at the bottom of the ice sheet. The till is dense, tough and relatively impermeable and exists as a discontinuous blanket over the bedrock at Kingston.

The Kingston site is located on two parcels of land, west of New Hampshire Route 125 in Kingston, New Hampshire and of a fresh water marsh east of Route 125 which extends to Country Pond.

One parcel of land consists of approximately twenty-eight (28) acres owned by the defendant Senter, who leased approximately one (1) acre of the property to Ottati & Goss Corporation, six (6) acres to Great Lakes Container Corporation and a larger area to the Austin Powder Company. The second parcel consists of approximately five and eighty-eight one-hundredths (5.88) acres owned by Great Lakes Container Corporation. The marsh consists of approximately twenty (20) acres and was purchased by IMC in 1984 during the course of this trial.

Maximum land elevation is approximately one hundred forty (140) feet above mean sea level to the north, south, and west of the site and slopes to approximately one hundred twenty-five (125) feet above mean sea level at the eastern edge of the site along Route 125.

Two unnamed surface brooks on site were identified as the North Brook and South Brook in the evidence. North Brook flows eastward across the site, passing under Route 125 via a culvert and then into the marsh area west of Country Pond. The South Brook is fed by marsh areas located west and east of Mill Road. The South Brook flows eastward along the southern perimeter of the site, through a culvert under Route 125 and into the Country Pond marsh.

Route 125 runs north to south and separates the two parcels on its west from the marsh and Country Pond on its east. The Exeter-Hampton Electric power line easement, running northeasterly-southwesterly, divides the westerly portion into two (2) separate areas.

Private residences are located west, south and northeast of the site.

As of September, 1978 there were legal facilities outside of New Hampshire where sludge could be hauled as well as caustic waste. One such facility was located in Niagara Falls, New York.

New Hampshire would not allow dumping of waste within the state.

Procedural History of the Litigation

At the risk of some repetition, the chronological procedural history concerning the litigation is as follows. The United States filed its original complaint on May 15, 1980 naming the ten original debtors. Its claim was based on § 7003 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6973; the United States prayed for an order regarding the Ottati & Goss site against Ottati & Goss, Inc. Louis Ottati, Jr. and Wellington Goss, against Senter Transportation, Concord Realty, Bernard Senter, and Sally Senter, against Richard French and French Processing and against GLC, that would enjoin the defendants from further storage or disposal of hazardous waste at the site, direct them to secure the site and prevent further leaking from drums on the site, and direct them to devise a remedial plan for cleaning up the site. The United States also prayed for an order regarding the Kingston Steel Drum

(KSD) site against GLC that would enjoin it from further discharges, direct it to prevent further discharges, direct it to prevent further migration of chemical wastes from the site, and direct it to devise a remedial plan for cleaning up the site.

On October 2, 1980, the State of New Hampshire was allowed to intervene as plaintiff against all ten original defendants. Basing its claim on RCRA § 7002 (1978), 42 U.S.C. § 6972 (1978), and N.H. RSA 149 (1973), RSA 147:48 *et seq.* (1979), RSA 147 (1961), and common-law nuisance, the State prayed for an order that would grant the same relief sought by the United States, enjoin GLC from discharging pollutants at the KSD site without a proper permit from the New Hampshire·Water Supply and Pollution Control Commission, assess various civil penalties, order reimbursement of its enforcement costs, and award its litigation costs.

On November 25, 1980, the Town of Kingston, through Michael R. Priore, John I. Reinfuss, and Ralph E. Southwick, as citizens and as Selectmen of the Town, was permitted to intervene as plaintiff against all ten original defendants. Basing its claim on N.H.RSA 31:88 (1979 Supp.), which authorizes suits to enforce ordinances and regulations made under RSA 31:60 (1970), the Town prayed for an order that would grant the same relief sought by the United States and the State of New Hampshire, enjoin the defendants from violations of § 6.17 and § 7.40 of the Town's Zoning and Building Code, assess various civil penalties, enjoin defendants from activities that would constitute a nuisance at common law or under RSA 147:3, 4 (1977), order defendants to pay the cost of eliminating any such nuisance under RSA 147:7 (1977), and award its ligitation costs.

On January 9, 1981, the three plaintiffs were each permitted to file a First Amended Complaint. The United States added a common-law nuisance claim against the Senter defendants. The State of New Hampshire and the Town of Kingston amended their complaints to maintain con-

sistency with the pleadings of the United States.

On January 25, 1983, the United States filed a Second Amended and Supplemental Complaint, adding seven new defendants and new claims under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.* The United States asserted claims under CERCLA § 106(a) and § 107(a) against the ten original defendants and against the generator defendants (GE, Lewis, Lilly, Geochem, Quinn, and SRS) and IMC. In addition to the relief sought in its earlier complaint, the United States in the Amended and Supplemental Complaint prayed for an order regarding the Ottati & Goss site that would hold "defendants" jointly and severally liable and direct "defendants to reimburse plaintiff for all costs of removal and remedial action ...." and for an order regarding the KSD site that would hold IMC liable along with GLC for all remedies, assess a civil penalty for unauthorized discharges into waters of the United States, and order "Defendants to reimburse Plaintiff for all costs of removal and remedial action ...."

On June 23, 1983, the United States was permitted to amend ¶ 84 (mislabeled as ¶ 18 in the proposed order) of its Second Amended and Supplemental Complaint to state that hazardous substances discharged onto the ground at the Ottati & Goss site had entered the groundwater and "are migrating ... in the direction of the groundwater flow, under and into the Great Lakes Container Corporation site [KSD site] ...." The amended ¶ 84 also alleged under CERCLA § 107 that "Defendants are jointly and severally liable to Plaintiff ...for all costs of removal and remedial action incurred to respond to the release and threatened release of hazardous substances from both sites." The State moved in July 11, 1983, to amend the corresponding paragraph (¶ 30) in its Second Amended and Supplemental Complaint.

*Third party Complaints*

On July 26, 1982, before the United States had filed its Second Amended and Supplemental Complaint, GLC filed Third Party Complaints against Lilly, SRS, Lewis and GE, as persons who sent waste materials to the Ottati & Goss site, for contribution and/or indemnification should the plaintiffs prevail against GLC for either injunctive relief or damages regarding that site. In January, 1983, SRS, GE and Lilly filed counterclaims against GLC for indemnification and contribution. On March 9, 1983, GLC amended its Third Party Complaint to add a reference to CERCLA and a claim for negligent selection of a waste site operator. GE and Lewis responded with renewed claims for contribution and indemnification.

On August 26, 1982, the Senter defendants filed Third-Party Complaints against Lilly, SRS, Lewis, and GE as persons who sent waste material to the O&G site, for contribution and/or indemnification should the plaintiffs prevail against them for either injunctive relief or damages regarding that site. In response, Lilly, Lewis, and GE filed counterclaims against the Senter defendants for indemnification and contribution.

On August 27, 1982, GLC filed a Third Party Complaint against IMC, as prior owner of the KSD site, for contribution and joint and several liability should the plaintiffs prevail for either injunctive relief or damages regarding that site.

On March 14, 1984, GLC and IMC stipulated to the dismissal of GLC's Third Party Complaint and IMC's proposed Counterclaim to that complaint.

*Crossclaims*

In their answers to the Second Amended and Supplemental Complaint of the United States and the State of New Hampshire, SRS, GE, Lewis and Quinn added crossclaims for contribution and indemnification against the Ottati & Goss defendants, the Senter defendants, the French defendants, and GLC. GLC filed answers to all these crossclaims, the Senter defendants answer-

ed only the crossclaim of Lewis, while the other parties filed no responses.

On June 27, 1980, the Senter defendants moved to dismiss. The Court denied this motion on October 20, 1980.

On December 2, 1980 the Court granted plaintiff's motion for a preliminary injunction that the ten original defendants should (1) cease storing or disposing of solid and hazardous waste at the O & G site, (2) formulate within thirty days a plan for removal of such waste from the site, (3) remove all such waste from the site within thirty days after approval of the plan by EPA and the State, and (4) cease activities at the site without prior approval, and (5) report weekly to EPA and the State concerning planning the removal activities.

On January 9, 1981, the United States, the State of New Hampshire, and the ten original defendants signed an Agreement which, while deferring the issue of liability under trial, stated that if the Court were ultimately to find any of the defendants liable for conditions at the Ottati & Goss site and required to clean up the site, said defendants "shall pay, in accordance with the order of the Court, the reasonable costs incurred by the United States in performing the preliminary clean-up measures...." The Court approved this Agreement on January 15, 1981.

On January 20, 1981, summary judgment was granted in favor of defendant Sally E. Senter.

In the fall of 1982, Lilly, GE, SRS and Lewis moved to dismiss the third-party complaints of GLC and the Senter defendants. The Court denied those motions on January 4, 1983.

On March 25, 1983, IMC moved to dismiss or for summary judgment. On September 19, 1983, the Court granted IMC's motion as to all allegations concerning the Ottati & Goss site and denied the motion as to all other allegations.

On June 30, 1983, the Court ordered that the trial be bifurcated into liability and damages phases. The Court also extended the discovery deadline until October 1, 1983.

On September 19, 1983, the Court extended the discovery deadline to November 1, 1983, and ordered that all pretrial materials be submitted by November 15, 1983.

On September 20, 1983, IMC moved to add a third-party complaint for contribution against 94 corporations which, it alleged, contracted to have drums reconditioned at the facility on the KSD site. The Court denied this motion on October 3, 1983.

History of the Ottati & Goss Site

The chain of events which occasioned this prolonged, complex and intricate litigation seemed innocuous at the outset.

Louis Ottati and his father-in-law Wellington Goss went into the drum reconditioning business which was operated from 1977 to 1979. The business corporate name was Ottati & Goss, Inc.

Ottati had prior experience at Kingston Steel Drum from 1969 until 1976. Wellington Goss' role was a passive one, but he did work on site.

The site was leased from Bernard Senter and their equipment consisted of a front loader, mixing bin and a platform truck used as a dock.

The processing method was to mix the waste with sawdust and lime. The front end loader was used to turn it over. After mixing, it was put in a dumpster to be transported from the site.

Ottati submitted an application to patent this processing of waste method.

When drums were emptied they were sold. Their first customer was General Electric.

General Electric drums were picked up at its Chelsea, Massachusetts plant and brought on site. Most of them were in relatively poor condition.

GLC which was contiguous to the site sent them mostly junk drums which could not be reconditioned.

Ronald Boudreaux solicited most of Ottati's customers such as Lilly Chemical, Sol-

vents Recovery Service, Lewis Chemical, K.J. Quinn and Geochem.

Ottati never had any direct contact with Quinn; he went to Massachusetts once to speak to Lilly's shipper. He also had direct contact with Solvents Recovery Service and Lewis Chemical representatives.

Processing commenced on or about April 1, 1978, slowed down in the winter and ceased in May, 1979. On a good day 90 to 100 drums were processed.

In May, 1979, he was negotiating to sell the business to Richard French. With the exception of Solvents Recovery Service none of his customers were notified.

Ottati admitted that when he first started processing, half of the drums would be put on the platform truck, half on the ground and he observed spilling of sawdust waste which subsequently was picked up.

French who has defaulted in this case started in business in June, 1979 and shortly thereafter had problems both financial and also from a business perspective. The State of New Hampshire wanted an indemnity bond from French as new state regulations were imminent as of July 1, 1979.

Ottati & Goss and French both received cease and desist orders from the Town of Kingston on July 30, 1979.

When leasing the land from Senter, Ottati agreed not to discharge any material on the ground.

In August, 1979, Ottati was asked by the State of New Hampshire to go on site and cover the drums to prevent their leaking.

Subsequently both Ottati & Goss were sued in a state court by Senter. The court ordered them to remove waste materials and contaminated soil.

The operation started running behind in January, 1979 when they were taking in 250 drums a month. Drums were taken in until May, 1979. Ottati found that K.J. Quinn barrels were in excellent condition and IMC attempted to keep its premises clean.

Some of the defendant generators entered into agreements or stipulations with the plaintiffs relative to the number of barrels or drums that they respectively had brought upon the Ottati & Goss site.

Waste sent to the site by Quinn was sent in 55 gallon steel drums and 5 gallon steel pails. Approximately 64 drums or pails were deposited on site. Shipments were made between January 24, 1979 and April 18, 1979.

There were three categories of industrial waste products generated by Defendant Quinn & Company, Inc. The categories were the solid and semi-solid residues created when solvents were used to rinse or wash equipment, off-specification products that were not sold to Defendant Quinn & Company, Inc.'s customers, and off-specification raw materials.

Xylene, methyl ethyl ketone, ethyl acetate, acetone, methyl isobutyl ketone, tetrahydrofuran, toluene diisocyanate, and isopropanol were among the solvents used in the production of Quinn's products.

At all relevant times, the most commonly used solvent in the equipment washing or rinsing process was methyl ethyl ketone.

At all relevant times the characteristics of the waste products of Defendant Quinn & Company, Inc. were flammability, toxicity, acidity, or a possible irritant to the skin and eyes.

On or shortly before March 6, 1978 General Electric began shipping waste products in 55 gallon steel drums. Four hundred fifty-eight drums were shipped; the last shipment was made before June 2, 1978.

General Electric's Chelsea, Massachusetts facility which shipped waste materials to the Ottati & Goss site purchased acetone, butanol, isopropanol, methyl ethyl ketone, methyl isobutyl ketone, methylene chloride, toluene and xylene to use in the manufacture of its industrial coatings. It also purchased alkyd resin, epoxy resin and acrylic resin for use in the manufacturing of its industrial coatings. The same types of raw materials were used to manufacture paints and lacquers.

Some of the waste products were highly flammable and some of the drums were in poor condition.

Lilly Industrial Coatings, Inc., formerly Lilly Chemical Products Inc., made ten shipments of waste drums from May 24, 1978 to January 24, 1979 in 55 gallon steel drums. They made ten shipments of waste totalling 670 drums. Their wastes consisted of off-specification paint and spent solvents and were flammable.

The waste was shipped in 55 gallon drums, some of which were 17 H drums.

The constituents of Defendant Lilly Industrial Coatings, Inc.'s waste included toluene, acetone, methyl ethyl ketone, xylene and methyl isobutyl ketone.

Lewis Chemical began shipping wastes during the month of February, 1979 in 55 gallon drums. Shipments were also made in June and July, 1979, which included sludges and liquids.

Lewis Chemical agreed that it had sent at least 732 drums of waste to the site.

The chemical constituents of the wastes sent to the Ottati & Goss site by Defendant Lewis Chemical Company included, among others, methylene chloride, 1-1-1 trichloroethane, trichloroethylene, methyl ethyl ketone, methyl isobutyl ketone and toluene.

Solvents Recovery Service of New England, Inc. shipped waste to the site. This included in 1978 and 1979 solid materials received from customers, "still bottoms" or residues from its solvent reclamation process, and flammable liquid wastes.

Waste products from Solvents Recovery Service sent to the Ottati & Goss site contained some or all of the following substances: acetone, butanol, chlorobenzene, cresol, cyclohexanol, hexanol, isopropanol, C-8 ketone, methyl ethyl ketone, methyl isobutyl ketone, methylene chloride, tetrachloroethylene, tetrahydrofuran, toluene, 1-1-1 trichloroethane, trichloroethylend and xylene.

The first shipment was on April 26, 1978.

GLC entered into an agreement with Ottati & Goss to initially send 30 drums of waste monthly to the Ottati & Goss site. They began shipping these drums in March, 1978. These shipments were continued until some time in May, 1979. On some occasions more than 30 drums a month were sent onto the site. Some of the GLC drums were immediately processed and returned to GLC by Ottati & Goss.

Drums sent to the Ottati & Goss site by GLC contained solvents which included oil, paints, resins, toluene, methyl ethyl ketone and lacquer thinner.

Some of GLC's drums contained liquid and sludge waste from its drum washing operation and other waste from its manufacturing process. Most of the GLC drums were in poor condition.

Louis Ottati was told by the New Hampshire Bureau of Solid Waste Management that there were no permits for operations such as his. The State of New Hampshire was aware that Ottati & Goss was processing waste in March of 1978.

During the periodic inspections by representatives of the State of New Hampshire, while Ottati & Goss was processing waste, the site was in a generally good condition. When evidence of any spillage was brought to Ottati & Goss' attention, it was immediately taken care of.

The Ottati & Goss site did not have any buildings on it. Customers sent waste in 55 gallon drums and 5 gallon pails. After the drums were emptied, they were stacked on their sides on the ground.

SCA provided Ottati & Goss with dumpsters and would haul full ones away.

Forty-five to ninety processed drums, more or less, would fill a dumpster. There is evidence that SCA from May, 1978 to May, 1979 removed 69 dumpsters from the Ottati & Goss site. During this time period at least 6900 drums of waste were sent to the Ottati & Goss site. Especially during the winter months, the drums started to backlog as the drum processing could not keep pace.

There were spills of sawdust and waste mixture on site. Liquids were observed leaking from the dumpsters.

The State of New Hampshire made a determination that the sawdust waste mixture could not be placed in a domestic landfill and Ottati & Goss were informed of this fact.

Shortly after French came on the premises, conditions at the Ottati & Goss site as of July, 1979 exacerbated or deteriorated.

During the summer and fall of 1979, there were drums on site without tops or bungs and many were leaking.

In the fall of 1979, there were drums in the area under the Hampton and Exeter powerlines. Some of these drums contained lab packs.

As the fall and winter of 1979 progressed into the winter of 1980, the site conditions became worse. Soil was discolored in the area of the mixing bin and discolored sawdust was also on the premises. Additionally, drums continued to leak as their condition continued to deteriorate.

The site was unsecured and letters were sent to Ottati & Goss, French and Senter directing them to remove contaminated soil by August 5, 1979. This was never done.

EPA'S DRUM REMOVAL ACTIVITIES

After preliminary planning, EPA from December, 1980 to March, 1981 had 24 hour site security which included observations and reporting of leaks from drums.

Drums were identified by numbering them and if necessary they were repacked. Some drums were covered with polyethylene. The drums were staged in four areas and inspected on a periodic basis.

Site security and site maintenance was maintained from December, 1980 through July, 1982 except from March 18, 1982 to early May, 1982.

In February, 1981 corrosivity, flammability, oxidation reduction, PCB, dioxin, and water reactivity tests were conducted on some of the drums in order to determine how to dispose of the waste.

Filter fences were constructed by EPA in April, 1981 to contain leaks and prevent spillage. Absorbent booms were also placed upstream of the filter fences. Absorbent pads were used to absorb chemicals.

Removal of waste drums commenced on or about May 21, 1982 ending on or about July 7, 1982.

This was done by the utilization of a drum crushing pit. A liner of polyethylene varying from 6 to 8 millimeters of thickness was laid on the ground at the bottom of the pit. It was laid in strips and overlapped. On top of the polyethylene liner was a six to eight inch layer of a clay-sand mixture which was not impermeable.

The crushing pit was located generally to the south and east of the Ottati & Goss formation, although the evidence on the issue was conflicting.

Berms were made on the outside of the pit from soil procured on site. There was a break in the berm to allow a vehicle or vehicles to enter the crushing pit.

Cut drains were constructed around the outside of the crushing pit. The purpose was to divert surface water run-off away from the crushing pit.

After the crushing pit was constructed and the original soil was laid over the polyethylene liner no one checked or measured the amount of original soil remaining. This resulted in a marked decrease of covering soil on the liner which contributed to at least two rips in the polyethylene liner.

The crushing pit was not monitored on a regular or continuous basis. As constructed, the pit was not environmentally safe for use in solidifying large amounts of liquids.

Drums containing liquids were crushed in the crushing pit. The State of New Hampshire was never advised that drums containing liquids in varying amounts were being crushed in the crushing pit, although this was done on practically a daily basis.

Conditions at the crushing pit were further exacerbated by rainy weather. A

small percentage of the drums crushed in the crushing pit had liquids of varying amounts which spilled into the pit.

The drum crushing pit did not have sufficient clayed soil or filler material; there were rips in the polyethylene liner during the processing and spillage of contaminated materials in the crushing pit.

The contamination penetrated beneath the polyethylene liner and went into the groundwater.

In early July, 1982 after all of the drums were crushed, the polyethylene liner, the silty clay material and solidification material on top of the liner, the berms around the pit, and some of the soil under the liner were removed from the site.

After the crushing operation was completed, EPA removed drum covers and rings, polyethylene, and visibly contaminated soil from the staging areas.

EPA did not remove all of the contaminated soil observed at the Ottati & Goss site because of budgeting problems and its belief that soil contamination extended to the water table.

The Ottati & Goss site from the summer of 1979 until the drums were staged by EPA constituted a fire hazard. Although the site was a fire hazard, no fire actually occurred on the premises.

Drums were sampled by EPA in April, 1980.

Nine volatile organic compounds were found in those drums—chloroform, trichloroethylene, acetone, toluene, methyl ethyl ketone, methylene chloride, xylene, ethyl benzene and 1.1.1 trichchloroethane. These compounds fall into three categories, chlorinated hydrocarbons, aromatic hydrocarbons and ketones.

Nonchlorinated solvents can produce carbon monoxide. Chlorinated hydrocarbons can cause asphyxiation.

The primary routes of entry of chemical substances into the body are ingestion, inhalation, injection and absorption through the skin.

Chloroform, a chlorinated hydrocarbon compound can cause injury to the central nervous system, and the liver, and can cause cardiac arrhythmia.

Trichlorotheylene is a very common solvent. It can produce coma, liver and kidney damage, as well as ventricular fibrillation.

Methylene chloride can cause central nervous system depression and cardiac irregularities.

1.1.1 trichloroethane also called methyl chloroform can produce anesthesia, depression of the brain function, cardiac irregularities and transient liver and kidney injury.

Toluene can cause anesthesia, liver injury, potassium deficiency and ataxia.

Methyl ethyl ketone is an eye and skin irritant.

Acetone is an anesthesic agent, skin irritant and can increase one's susceptibility to liver injury.

The Ottati & Goss site constituted a substantial and imminent danger to public health. The soil under the original drum formation and the crushing pit are contaminated.

There were more than one hundred drums on the Ottati & Goss site that contained PCB's. Furthermore, 3,965 drums were analyzed as having contents which were hazardous.

Leakage from the drums from June, 1979 into 1980 on the Ottati & Goss site contaminated the ground surface. Soils at the site are very permeable and the groundwater table is not too far from the surface as a result of which the groundwater was contaminated.

Drums were deteriorated so that many were leaking at the time they were staged. The drums were staged in four different areas.

The surface water on the site ran generally southerly to northerly.

The History of the Kingston Steel Drum Corporation ("KSD"), International Mineral ("IMC") and the Great Lakes Container

Corporation ("GLC") Site

The KSD site has a fairly long chronological history. With its successive owners, it was used from approximately the mid–1950's until GLC ceased operations in 1980.

The initial owner operator was an individual named Daniel Conway (now deceased) who operated under the name Conway Barrel until 1967. In 1968 Leroy Boudreaux and Daniel Conway formed KSD. The facility expanded in size as did its operation. The facility was on 5.88 acres of land which consisted primarily of a building which housed a caustic wash operation for removing waste residue from closed head drums and other drum reconditioning machinery, and a nearby incinerator for removing waste residue from open head drums. An unlined lagoon for the disposal of waste residue also was located on the property.

As the facility was expanded from approximately 1962 through 1974 the caustic lagoon was moved more towards the westerly area of the KSD site.

KSD processed between 500 to 700 barrels daily in 1966 which increased to 1,200 barrels daily prior to IMC purchasing the facility in 1973. IMC was able to increase production to 2,000 barrels per day.

IMC purchased the KSD property in May, 1973 and owned and operated it until August, 1976 when it was sold to GLC.

IMC was aware that there might be environmental problems with the KSD site at the time that it was purchased but the problems could be solved. After the purchase IMC substantially expanded the operation.

Drinking water wells on site had not been used since 1966 because testing of the groundwater indicated that it was contaminated.

Holding or evaporating ponds and lagoons were recognized during the period 1973 through 1977 on NPDES (National Pollutant Discharge Elimination System) applications and discharges into such holding or evaporation lagoons and ponds did not require an NPDES permit, at least through 1977.

It was generally agreed that the KSD site was not adequate for drum reconditioning as the land was low and drainage was a problem.

IMC and subsequently GLC when they purchased from IMC leased land adjacent to the north and northwest of their property line. The land was used to store used drums before being reconditioned by IMC and later by GLC.

Route 125 borders the KSD site on the east. South Brook runs along the south side of the property; North Brook's direction is generally from west to east and it is located north of the KSD property.

To the east of Route 125 is a swamp with 10 to 20 feet of peat. The peat acts as a sponge or as a carbon filter. Easterly of the swamp is Country Pond which is 255 acres in size and is used for recreational purposes. Additionally, there are numerous homes contiguous to Country Pond many of which are year round residences.

IMC is not responsible for or liable for any releases into the environment or effects upon the health or environment from 1955 until May, 1973.

IMC is *not* responsible for or liable for any releases into the environment or for any effects upon the public health or environment caused by the operation of the Ottati & Goss site, which commenced operations more than two years after IMC had departed from Kingston. The non-liability of the defendant IMC for the Ottati & Goss operation is confirmed by the consent decree of September 19, 1983 by which the plaintiff United States of America stipulated to non-liability.

KSD, IMC and GLC had the same customers and handled the same chemicals and chemical product waste, including methyl ethyl ketone, toulene, benxene, solvents, paints, varnishes and different types of hydrocarbons and oils.

The amount of wastewater generated increased as the production increased when IMC took over in 1973. Neither IMC nor KSD drilled any test holes around the pe-

rimeter of the property for the purpose of sampling and analyzing groundwater.

### The Lagoon

The lagoon area was located west and north of the building and additions thereto located on the KSD site. Aerial photographs taken as long ago as 1962 show the area of the lagoon which grew in size or area until it was finally filled in during the year 1974 by IMC. The lagoon never had a lining.

In early 1973 the lagoon was 100 feet by 50 feet and its depth was at least three feet. The oil layer on the caustic lagoon was estimated to be one and a half feet deep.

During the latter part of 1973 IMC constructed a three to four foot embankment around the lagoon so it could hold more liquid. IMC filled in the lagoon in the spring of 1974.

From 1967 to 1973 a tanker hauled water from the wash room closed head operation to the lagoon in a 500 gallon tanker once a day. Additionally for a period of time wastewater was pumped into the lagoon by means of a pipe.

The amount of gallons of waste varied. At the beginning of the operation, it was in the vicinity of 1,000 gallons which later escalated to 3,000 gallons a day. At one point, shortly before the lagoon was filled in, 5,000 gallons per day was pumped into the lagoon.

From 1966 to May 1973 paints, solvents, and oils from the caustic wash tank were dumped in the lagoon.

The samples analyzed by Defendant IMC in 1973 show that the caustic wastewater discharged into the lagoon was heavily contaminated, and the surface water runoff from the plant was measurably contaminated.

The lagoon sample indicated the presence of total dissolved solids at 31,570 parts per million, oil and grease at 28,300 parts per million, PCBs at 11 parts per million, phenols at 93 parts per million, and chloride at 660 parts per million. Waste from the caustic wash did contain dissolved metals.

Drums were placed in and were seen floating in the lagoon. Materials would leak out of the lagoon when it rained and proceed northerly to a pond known as the Kingston swamp. Sometimes liquid was removed from the lagoon to prevent an overflow.

The lagoon was not pumped out before it was covered over. It was pumped out to prevent any further groundwater damage and to eliminate a potential source of odors.

The lagoon and the contamination from the Ottati & Goss site and the exacerbation of conditions at the Ottati & Goss site by the 1982 operation of the crushing pit by the EPA all contributed to the contamination of the groundwater. All are probably a source of contamination at this date.

Well P-12 was drilled within the area of the former lagoon. There were organic contaminants to a depth of approximately 19 feet where well P-12 was drilled. At the 10 foot interval, there was a substantial amount of organic contaminants such as tetrachlorethylene and toluene. These tests were taken in September, 1983.

An earlier drum rupture had minimal contribution as far as visible soil contamination was concerned regarding the drilling of well P-12.

The lagoon was never used for any purpose of disposal of industrial waste by IMC after it was filled in during the spring of 1974.

### The Kingston Swamp Area

The Kingston Swamp Area has also been alluded to as the Kingston Pond.

Its location was generally between the lagoon and the access road along the Kingston and Senter property line.

In 1966 the swamp area was larger than the lagoon and was a couple of feet deep. The swamp was filled in after the lagoon.

Prior to 1967 the swamp area had been generally used as a dumping area and barrels, barrel parts and other debris had been buried in that area.

Drums were placed in the swamp. At one time employees washed their hands there until the water became too oily.

Liquid wastes were poured into a culvert and then ran into the swamp. Waste was also transported to the area by a backhoe. Some drums were buried, others emptied into the swamp. This practice stopped when IMC bought out Kingston Steel Drum. Drums and waste were buried there after GLC bought out IMC.

### The Incinerator

During the Conway Barrel era and continuing on, an incinerator was used in the cleansing and reconditioning of barrels.

The incinerator installed by Conway was replaced in 1966 by an incinerator from Northeastern Barrel.

Prior to IMC purchasing the property a Jarvis incinerator was installed in the spring of 1972 and was in operation by January 1, 1973.

The incinerator was used to burn the material or wastes in the drums. The Jarvis had the capacity to burn the waste, but in order to eschew an air pollution problem, the after-burner was remodeled by KSD and passed a stack test which was done by IMC in 1973.

During the period prior to 1972, a concrete pad for an incinerator was in existence three to four feet below the 1984 ground level and a disposal tank built of concrete was also in use in connection with that earlier incinerator. The incinerator pad itself was connected to the Kingston Steel Drum area by underground pipe. All of the installations were put out of use in 1972 when Kingston Steel Drum extended its plant to the west; increased the grade, and built a new incinerator pad which was still in existence in 1984.

A new incinerator stack was installed by Defendant IMC in February 1976 and was tested initially in March 1976 and subsequently in June 1976.

The pit in front of the incinerator was three feet deep, four feet wide and four feet long.

The incinerator was devised or constructed so that an endless belt took open head drums to the incinerator where any wastes within the drum were incinerated or burnt.

The 1972 installation of the new incinerator included the building of a concrete pad for the incinerator and for the burner, including a concrete pad under and extending to either side of the conveyor belting by which the empty open-head drums were carried to the burner of the incinerator.

Under that conveyor track, as part of the 1972 installation, a concrete trough was built of reinforced concrete to catch whatever debris or partially burned residue might fall from the burner or from the barrels. That trough was constructed so that a front-end loader or similar equipment could pick up the debris periodically, load it into a dumpster or other vehicle, after which it was deposited off-site. That concrete trough remained intact until it was removed during the IMC clean-up of the site in August of 1984.

Most of the sludge would go through the incinerator, be burned, come out the back, dried and then shoveled out. A backhoe was used to remove residue from the bottom of the pit. The pit was completely cleaned out every month and a half to two months and partially cleaned out every other day. Sometimes a truck load of waste would accumulate in the pit before it was cleaned out.

In September, 1978 piles of waste material covered the incinerator area, causing a considerable build-up of waste material up to a foot in depth. There was a concrete apron under the incinerator upon which waste materials had accumulated. The apron was not large enough to accommodate all the materials placed on it.

In May, June and July of 1980 at the GLC incinerator drums, sludge and pools of liquid were observed and photographed spilling out over the ground.

On March 11, 1980 sludge was observed spilled on the ground by the incinerator and conditions there were deplorable.

## Buried Waste and Drums

Drums were buried in an area north of South Brook and other areas on the western most part of the Kingston Steel Drum site. Drums were also buried in the lagoon, swamp area and north of the swamp area or pond and the tree line on the southern line of the property. They were buried on site between the years 1974 and 1979, albeit without top IMC's management's knowledge.

Drums were buried during Kingston Steel Drum's, IMC's and GLC's ownership.

Between 150 to 200 drums were buried on the GLC site between 1975 and 1977. Approximately 200 drums were placed in the lagoon and approximately the same number of drums in the swamp or pond area during GLC's ownership. Once buried, drums were not removed from the ground.

Drums were collected at the incinerator to be buried on the site. The drums were usually full and contained predrained material from drums processed at the incinerator, including liquids and solids. In addition, some of the drums contained material from the caustic wash operation. This practice stopped in 1977 as Ottati & Goss was disposing of the waste.

### Eastern Ditch Contiguous to the Westerly Side of Route 125

On the easterly side of the buildings at the KSD site is a ditch where water, liquids or other materials flow in a general southerly direction into South Brook.

As late as 1979 caustic water was pumped from a holding tank into tank trucks by means of a plastic hose coming from the east side of the building.

The tank trucks were originally owned by Kingston Steel Drum and were used to transport caustic water; they were old and most of them leaked.

Caustic water would spill very often in the course of pumping it from the washroom into the tank trucks. The gravel was built up to prevent it running down to South Brook. There was a barrel underneath the pipe. Its purpose was to catch any overflow, but it at times overflowed onto the ground.

A cement pad was poured at the eastern end of the building which had two catch basins underneath it for overflow in case of a spill.

Spill water in 1973 from the IMC plant ran into the ditch on the easterly side of the building and subsequently into South Brook.

Discharges from the caustic washroom, oil sheens, stained soil, pools of liquid and stressed vegetation in the ditch along the eastern side of the GLC building were observed in March and October of 1980, September and December of 1982.

In December, 1982 discharges from the caustic washroom ran over a retaining structure made of telephone poles in the easterly ditch and then flowed into South Brook.

### Surface Runoff

The subsurface geology and hydrogeology of the valley of the site correspond roughly to the surface topography, which is characterized by a gentle slope eastward toward Country Pond.

Most of the surface water runoff would occur in the spring flowing from west to east from the site and towards Country Pond.

Soil particle sizes on and around the sites vary widely and include clay, silt, sand, gravel, cobbles, and boulders. The soils are non-homogeneous and the particles are not well sorted.

Runoff continued to flow down into the eastern ditch although efforts were made to fill in the area near Route 125. This was a problem from 1966 on.

In 1973 at the request of the State of New Hampshire hay was placed in the ditch on the east side of the building to absorb the oil from the wastewater. This was done approximately two or three times in the summertime. The ditch had carried oil and oil spills into South Brook.

In a sample taken from the ditch in 1973 by IMC it showed a high level of pH, phenols, oil and grease which indicated pollution of the water.

Analysis of samples taken in 1976 by State personnel revealed that runoff on the site was highly contaminated and had contaminated South Brook. One sample showed contamination with phenols. Another sample was very alkaline and had a high chemical oxygen demand which indicates the presence of organic compounds. A further sample had an elevated pH, high concentrations of phenols and an elevated chemical oxygen demand.

IMC personnel felt that it was impossible to dike areas to stop surface water runoff coming from the west end of the property towards the easterly end of the property to try to divert it.

In March, 1980 standing water was observed on the GLC site.

A swale ran from south of the GLC property line north toward North Brook and was located on the GLC site. The drainage swale was observed in March of 1980. The swale was observed to have 1½ feet of standing water and an oil sheen in March, 1980. There were also drums in the swale. The concentration of a chemical spilled on the surface of soil is reduced by the operation of volatilization, vaporization, photodegradation, and biodegradation, the most significant of which is volatilization.

Volatilization, biodegradation, retardation, and photodegradation are all "reduction factors" with respect to the concentration of chemical compounds in the environment in that they all, in the ordinary course of natural events, reduce the concentrations of said compounds in the environment.

Surface water runoff from the location of the original drum formation is north towards South Brook. The stream flow direction of North Brook and South Brook is west to east.

On May 13, 1980 a photograph showed a wisp of sheen near the culvert, under the power line near Ottati & Goss. Another photograph on October 14, 1980 on the GLC property showed stained soil near the incinerator and contiguous areas.

In September, 1979, May, 1980 and November, 1980 sediment and/or surface water samples of that portion of South Brook east of monitoring well P-1 and west of monitoring well P-3 were collected and analyzed. Volatile organic compounds were present in the sediment and surface water samples. In 1979 and 1980 the Ottati & Goss site was a source of contamination for South Brook.

### Drum Storage

All drums received at the plant from 1966 through 1979 had some residue in them, although the amount of the residue varied with the customer and the substance in the drum. Between 1966 and 1979 the practice was to accept any drum which was empty enough that it could be cleaned by the operation. Drums with four to ten gallons of residue were regularly received by Kingston Steel Drum and Defendant IMC and Defendant GLC until 1979.

As the inventory of barrels increased, the Senter leased property was used to store drums west and north of the access road. This was also done by IMC to rotate their inventory. Some drums were stored vertically and some horizontally.

Neither IMC or GLC periodically went through the site to remove leaking drums or check the bottom layer of drums.

Drums which were stood on end tended to deteriorate on the end that was placed against the ground, while drums on the bottom tier of the horizontally stacked pyramid deteriorated faster because of the exposure to water and snow. The principal method of storing drums was on their side.

When there is liquid in the drums, they were not stored on their sides, they were left on trailers or brought to the incinerator to be processed.

In April, 1976 barrels were stacked haphazardly, some standing upright and some on their sides, and others at an angle. Chemicals were leaking and had leaked

from these barrels and had contaminated the ground surrounding the drum storage area. The contaminated runoff moved in an easterly direction to the drainage ditch to the east of the plant and subsequently into South Brook. The contaminated run-off originated from the entire site.

In 1978 the operation of GLC's barrel cleaning operation was very messy and there was considerable dumping of waste in the area.

In September, 1978 contents of the drum storage area had leaked or had been leaking onto the ground. The ground was discolored and was thoroughly covered with waste material. The area of contamination covered almost the entire Great Lakes yard.

State personnel inspections from March, 1978 through July, 1979 failed to disclose an improvement in the GLC operations which would have remedied contamination of the area.

Stained soil, black sludge on the ground, pools of discolored water, and containers with materials leaking out of them were observed on the GLC site in 1980.

### Sawdust·Pile

The process of mixing waste with saw-dust began on the GLC property in late February, 1979. This continued until the plant closed.

Defendant GLC began purchasing saw-dust in February, 1979 from Ottati & Goss, Inc. The large accumulation of mixed waste and sawdust, which partially overlapped the location of the former caustic lagoon west of the Kingston Steel Drum plant, was a probable source of groundwater contamination as it exacerbated conditions as they were during the period of time that it was in operation.

The sawdust pile was located near the site of the former lagoon. It was located about 200 feet west of the building where the lagoon used to be. The sawdust pile was not as large as the lagoon. The pile became as large as 25 feet wide, 40 to 50 feet long, and about 15 feet high.

The GLC sawdust pile was observed in January and March, 1980 to be about 50 yards long by 20 yards wide by 4 yards high and to contain sludge mixed with saw-dust.

There was no polyethylene lining under the sawdust pile or over the top of the pile.

GLC started the process of mixing waste with sawdust when the dumpster service was curtailed and they could not get rid of the waste.

The incinerator sludge, the holding tank sludge and the caustic washwater were all mixed with sawdust in the same bin located northwest of the incinerator. Sawdust was also mixed with sludge which came from holding tanks in the washroom area.

In March, 1980 samples were taken from the perimeter of the sawdust pile. The sawdust pile was saturated with water which washed volatile organics off the pile. The samples ranged from surface samples to samples taken from a depth of up to 6 inches. Whenever there was a heavy rainfall, the rain would soak through the sawdust pile and different color liquids would emanate from the pile. This would result from all the different chemicals that were mixed in with the sawdust.

The GLC sawdust pile area is still an active source of contamination.

GLC voluntarily removed 20 truckloads of contaminated sawdust from its site.

### GLC Cleanup

At the request of GLC, P.E. LaMoreaux & Associates in November of 1982 performed a study to determine how best to clean up the GLC site.

As a result of its study, LaMoreaux prepared a report dated January 13, 1983 recommending three primary elements: removal or isolation of point sources of contamination, groundwater reformation, and the establishment of a comprehensive and permanent monitoring program.

By virtue of GLC's agreement with IMC, GLC contributed to the efforts and shared in the expense with IMC in further clean-up of the GLC site.

After GLC ceased operations in July of 1980, it conducted an extensive clean-up and removal of barrels in the fall of 1980. GLC removed thousands of drums from its site.

### IMC Cleanup

During the trial of this case in the spring of 1984, International Minerals & Chemical Corporation retained Camp, Dresser & McKee to prepare the specifications and drawings to effect a clean-up of the surface and subsurface soils throughout the entire 5.88 acres of the Great Lakes Container Corporation site. The objective of the project was to remove contaminated soils and any other drums or foreign materials on the site.

Clean-up operations proceeded from June 26, 1984 through November, 1984. The only materials remaining on-site after November, 1984 consisted of contaminated soils for which there was no EPA approved disposal facility available until the spring of 1985.

Approximately 2.8 to 3 million dollars was expended by IMC in its cleanup of the KSD site.

During the IMC clean-up of the GLC site, soil excavation in all areas proceeded to a depth of one foot below the deepest soil determined to be contaminated and requiring removal.

Test trenching was also done to the south side of the building and along the southeast corner of the building.

Part of the site was scarified, that is one foot over the entire area was scraped off.

When the concrete apron or trough on the westerly side (input side) of the incinerator was removed, drum debris was found underneath it and a subterranean concrete tank was discovered just northerly of the apron. The soil on top of the tank in the vicinity of an opening into the tank was discolored.

There was no evidence that the tank had leaked at anytime.

In the process of digging up and removing the incinerator pad, a second concrete slab four feet below the surface was found extending east and north of the original incinerator pad, but also overlapping beneath the surface incinerator pad. There was no apparent connection between the two concrete slabs, nor was any functional relationship apparent. It appeared to be just another slab. The soils throughout this area and the area of the subsurface concrete slab were relatively clean.

Any drum found to contain more than three inches of material in it was labeled "full" for purposes of the IMC site clean-up. During the routine trenching and excavation, 326 such drums were found on the Kingston Steel Drum site.

Of those drums, only 17 were found randomly located in the south trenching areas, and only 5 of those were possibly found in the previous location of the caustic wash lagoon.

The vast majority of contaminated soil, buried debris, gross chemical and resin contamination, and buried drums containing material found on the Kingston Steel Drum site during the clean-up performed by International Minerals & Chemical Corporation was located in the area previously used and described as the Kingston Swamp, north and northwest of the incinerator constructed in 1972 and south of the access road leading from Route 125 to the power lines.

All drums containing material were removed to and handled in the drum staging area which was enclosed with a cyclone fence and had a concrete pad which had been coated to prevent liquid from seeping into the concrete.

The cache of staged, deliberately buried drums was uncovered on September 19–20, 1984 in the next northerly trench. The cache contained 61 drums, all of which were intact and in "pretty good condition". None of the drums in the cache were leaking. The drums in the cache showed Department of Transportation (DOT) date stamps of 1973, 1974, 1975 and possibly 1976.

Subsequently, another apparently staged burial of nine full drums was discovered in late November, 1984.

Visually contaminated soils, upon excavation, were segregated and later hauled off-site. Also segregated were stained soils which were subsequently aerated.

Four thousand eight hundred and thirteen (4,813) tons of contaminated soil, crushed drums, and metal debris were removed from the Kingston Steel Drum site. An additional, estimated four thousand (4,000) tons of soil was staged for excavation but remained on-site through December, 1984, because there was no EPA-approved facility available to receive it. It has now been removed.

Approximately 4,500 gallons of bulk liquids were removed from the Kingston Steel Drum site as a result of the International Minerals & Chemical Corporation clean-up. As the 61 drums found in the staged cache northeast of the site of the former caustic wash holding pond were substantially full, accounting for approximately 3,050 gallons of liquid, the remaining 265 drums containing material on the site collectively had only approximately 1,450 gallons of liquid in them, representing less than 30 full drums or, on average, between 5 and 6 gallons of liquid each.

General Site Geology and Hydrology

Reference is made to pages 4 through 7 of the court's findings where some of this subject matter has been succinctly alluded to. Generally, the site is a very typical, New England terrain and geology, consisting of a platform or a basement of crystalline bedrock, a hard, crystalline mass of rock, that exists anywhere from 25 to 50 feet below the surface of the ground.

Over that is a layer of overburden, that is composed of unconsolidated materials, materials like sand, peat and silt, that constitutes a 25 to 50 foot interval.

This material was deposited mainly by glaciers. There is a layer of glacial till that lies and rests right on the surface of the bedrock; and over that is what is referred to as either stratified drift, or in some places, ice-contact material; and then above that, again, varying from place to place on the site, outwash or, in the vicinity of Country Pond, a body of bog material, which is an old lake deposit.

The Ottati & Goss and KSD sites are located in a glacial valley. The surface and subsurface features on and around the two sites were created by the glaciation process.

The subsurface geology and hydrogeology of the valley correspond roughly to the surface topography, which is characterized by a gentle slope eastward toward Country Pond.

The subsurface area between monitoring well W–17 and Route 125 is underlain by several geological materials. The bottom of the system is defined by the bedrock. The materials directly above the bedrock are unconsolidated glacial sediments which consist of sand, silt, clay, gravel, cobbles and boulders. These materials were deposited during the movement of the glaciers in this area. Unconsolidated glacial sediments are subdivided into several groups. Till, the material generally deposited on top of the bedrock, is deposited by the glacier. Ice-contact deposits, generally underlain by bedrock or till, are materials that are deposited adjacent to or in close proximity to the glacier. Outwash deposits are materials that are deposited as a glacier is melting. These deposits, in contrast to ice contact deposits, are not deposited adjacent to or in close proximity to the glacier. The permeability of a geological section is dependent on the type of sediments present, how compacted they are, and how well-sorted they are. Generally, bedrock is nearly impermeable. In ascending order of permeability, there is till, ice contact deposits, and outwash deposits.

Over twenty-five years ago sand and gravel were removed or mined at the Kingston site and this continued. When the glacier left, there was a mound of such materials deposited between North Brook and South Brook in the general form of an esker; at the outset of this case that entire area was relatively flat. Top soil and grav-

el deposits had been removed from 10 to 40 feet in depth. Consequently, little, if any, vegetation or organic top soil exists on this site, the underlying unconsolidated deposits being now at the surface.

Due to the rather complete absence of topsoil (except in marshes or small swamps along the streams) the groundwater aquifer under the site west of Route 125 is an *unconfined aquifer*. The explanation is that the water table is at atmospheric pressure, and that when it rises to the level of the surface of the land it becomes surface water. This creates a condition known as *groundwater seeps*, which exist on both North Brook and South Brook, and at the Ottati & Goss site, where observers have seen groundwater entering the streams. Conversely, in an unconfined aquifer when the groundwater drops below the level of the bottom of the streams, surface water from the streams *re-charges* the groundwater, unless *perched* by organic sediments.

Another aspect of the unconfined aquifer resulting from the mining and removal of vegetation and top soil, is that a larger percentage of the 40 inches of annual rainfall infiltrates through the gravel to *charge* the underlying groundwater aquifer.

The amount of water stored in the aquifer is influenced by the porosity of the geologic material, which constitutes the aquifer, the porosity being the percentage of water which can be held between the pore spaces of a material. An aquifer is a geological formation capable of yielding useable amounts of water to a well. The aquifer in Kingston is recharged by the rain and snow that fall in the watershed area of the valley.

The zone of soil between the surface and the top of the water table was known as the unsaturated zone. Within the unsaturated zone various chemical processes and physical phenomena effect the movement of dissolved chemical substances. One physical phenomenon is capillary pressure. As water or chemicals are deposited on the surface and begin to move downward from the surface some of the fluid becomes trapped in the small pore spaces between the grains of the sediment. With each successive precipitation event some of the fluid entrapped in the pore spaces is released. Adsorption, which results in the partitioning of a dissolved substance between the water phase and the soil phase, has a similar effect. As the dissolved substance moves through the unsaturated zone a portion of the dissolved substance adheres to the sediment. As water flows pass the chemical that has become adsorpted the chemical reaction is reversed and part of the chemical desorbs into the passing water. The effect of adsorption and the capillary pressure phenomenon is to slow down the movement of contaminants through the unsaturated zone and to render a spill or similar event a longer term source of groundwater than it otherwise would be.

Immiscible species are chemical species that are present as undissolved chemical species.

Groundwater flows from areas of higher potential energy to areas of lower potential energy. The water level measured in a well is a measure of the potential energy of water at that particular point. Given a series of water level measurements one can construct a groundwater contour map by drawing lines which connect points of approximately equal water level. Groundwater flow will be from areas of higher water level to areas of lower water level. The average path of a particle of water as it flows from an area of higher water level to an area of lower water level can be shown by drawing a line, referred to as a flow line, at right angles to the water table contour lines.

Regional groundwater flow direction in the area of the Ottati & Goss site and Great Lakes Container Corporation property is from the southwest to the northeast.

The water table at the sites is relatively close to the land surface (generally zero to seven feet) and fluctuates up to several feet seasonally due to variations in precipitation and recharge.

The marsh east of Route 125, as well as the swampy areas along North and South Brooks near the sites, are comprised of organic peat deposits. The peat ranges in thickness from several feet in the South Brook marsh near the Ottati & Goss site to approximately 20 feet thick near the center of the marsh.

Due to the presence of depth of an area of the peat deposit, contaminants which have passed easterly of Route 125 are either trapped in the peat, or forced down to the outwash deposits below the peat.

Country Pond is east of the marsh and in some areas Country Pond and the marsh are contiguous.

The total groundwater and surface water flow into Country Pond is over five billion gallons per year, of which a small fraction (about 3.5 percent) originates at the Ottati & Goss and Kingston Steel Drum sites.

Based on actual precipitation for the twenty years ending about 1981, the Kingston area receives average annual precipitation of about 40 inches, approximately 50 percent of which recharges the groundwater and surface water. The remainder is lost to evapotranspiration.

Country Pond drains a watershed of approximately 10,000 acres. The sites are a relatively small component (i.e., less than 5 percent) of the land area of the watershed which discharges into the Pond. There is also evapotranspiration which is the water that is lost through plants.

### Groundwater Contamination

Monitoring wells have been installed on the GLC property by various agencies working for the plaintiffs and defendants.

Pursuant to Section 311(b)(2)(A) of the Federal Water Pollution Act, 33 U.S.C. 1321(b)(2)(A), EPA designated the following chemicals found at the Kingston site as "hazardous substances": acetone, benzene, benzyl chloride, bis(2-ethylhexyt) phthalate, butanol, 2-butanone, chlorbenzene, chloroform, creosol, 1,1 dichloroethylene, 1,2-dichloropropane, ethyl benzene, napthalene, PCBs, styrene, toluene, trichloroethylene, xylenes.

Pursuant to Section 307(a) of the Federal Water Pollution Control Act, 33 U.S.C. § 1317(a), the EPA designated the following chemical substances found at the Kingston site as "toxic pollutants": arsenic, benzene, beryllium, cadmium, chloroform, copper, 1,2 dichlorobenzene, 1,3 dichlorobenzene, 1,4 dichlorobenzene, 1,1 dichloroethylene, ethyl benzene, fluoranthene, isophorone, lead, methylene chloride, napthalene, nickel, PCB's phenols, tetrachloroethylene, toluene.

Pursuant to Section 3001 of the Resource Conservation and Recovery Act, 42 U.S.C. § 6921, the EPA designated the following substances found at the Kingston site as "hazardous waste": acetone, arsenic, benzene, bis (2-ethylhexyt) phthalate, butanol, 2-butanone, chlorobenzene, chloroform, creosol, 1,2 dichlorobenzene, 1,3 dichlorobenzene, 1,4 dischlorobenzene, 1,1 dichlorothane, 1,1 dichloroethylene, 1,2 dichloropropane, 2-4 dimethylphenol, fluoranthene, methyl ethyl ketone, methyl isobutyl ketone, methylene chloride, nepthalene, phenol, 1,1 2,2,—tetrachloroethane, tetrachloroethylene, tetrahydrofuran, toluene, 1–2 trans-dichlorethylene, 1,1,1-trichloroethane, trichloroethylene, vinyl chloride, xylenes.

The five chemicals Charged against IMC were 1.1.1 trichloroethane, toluene, methylene chloride, trichloroethylene and ethyl benzene.

Groundwater contamination occurs when contaminants are released and enter the groundwater system. Organic contaminants on the land surface go into the unsaturated zone. In time, the contaminants due to precipitation such as rain or snow melt and are washed down through the unsaturated zone and into the saturated zone. On entering the groundwater system, the contaminants will move with it in whichever direction the groundwater is moving.

The entry of chemicals into the groundwater is intermittent. In the saturated zone, the contaminants mix with the groundwater in the aquifer and become dissolved in it.

Wells were installed by P.E. LaMoreaux and Associates (PELA), Goldberg-Zoino and Associates (GZA) and Camp, Dresser and McKee (CDM) on the GLC site.

Monitoring well W–14 which is located on GLC property was sampled and analyzed commencing in June, 1982 through August, 1984 on six different occasions. Volatile organics have been noted at all times except one.

Wells W–18 and W–22 also on GLC property have also been sampled and analyzed seven different times from June, 1982 through August, 1982. Volatile organics and other compounds have been detected on each occasion. They were installed by Ecology and Environment.

Wells 18 and 22 were to the west and northwest. The soil above the groundwater where these wells were located was heavily contaminated.

Due to conditions which existed at the time, wells W–18 and W–22 were installed; volatile organics, odors, and soil appearance were observed and self-contained breathing devices were used.

With the exception of P–3, total volatile organics were detected in each of the PELA wells which were first sampled in June, 1982 with the exception of P–12.

With the exception of P–8 on-site PELA wells were sampled again by CDM in September, 1983 and many compounds were detected.

In December, 1983 well P–8 was sampled and two compounds were detected.

Well P–5 has been sampled on four subsequent occasions and volatile organics were detected on the second occasion in November/December 1983 and the fourth occasion in August, 1984. Well P–6 has been sampled on four subsequent occasions from November/December, 1983 until August, 1984 and volatile organics were found on each occasion. Well P–12 was sampled in December, 1983 and August, 1984 with volatile organics detected on each occasion.

Monitoring well P–12 was installed in the general area of the lagoon and the GLC sawdust pile. Soil samples taken during the well installation documented contaminated soil to a depth of nineteen feet.

P–8 was installed at the southeast section or end of the GLC building. Samples taken and analyzed in 1983 and 1984 disclosed volatile organics, PCBs and other compounds.

Monitoring wells GZ–11A, GZ–11B, GZ—11C, GZ–12A, GZ–12B, GZ–12C, and GZ–13 were all sampled in December, 1983, January, February, 1984 and August 1984 and on every occasion volatile organics were detected in the samples.

When sediment samples and water samples were taken on December 1, 1982 in the vicinity of the caustic washroom loading dock and in the ditch east of the GLC building and alongside Route 125, compounds were detected.

### Danger Or Harm Related to Groundwater Contamination

The Town of Kingston does not have a municipal water service and residents rely on wells or the groundwater system for their drinking water. There is no evidence that any resident of Kingston or its contiguous environs has or is in danger of having their drinking water contaminated by past operations at either the Ottati & Goss or Kingston Steel Drum site. The latest census of the Town of Kingston is that it has 4,825 inhabitants as of July, 1983.

One of the main concerns is what effect groundwater contaminants might have had or will have in the future upon Country Pond and its environs.

Country Pond is used for swimming, boating, fishing, ice skating and snow mobiling. There are four campgrounds along Country Pond's shores. There are numerous residential sites along its shores as well as residential developments in close proximity to Country Pond.

With reference to deleterious effects of chemicals in groundwater, evidence was presented regarding clinical toxicology. Clinical toxicology is the study and practice of diagnosing and treating victims of poisoning.

The scientific community collates all the information that it has based on laboratory data, etc. and then establishes acceptable exposure limits. The effects concern chemical harm or injury to various parts of the human anatomy such as the liver, kidney, brain or genetic defects or cancer. The acceptable limit is set forth in parts per billion or micrograms per liter.

Organic chemicals found in groundwater samples included vinyl chloride, benzene, tetrachloroethylene, trichloroethylene and 1.1 dichloroethylene.

Generally, people should not be exposed to concentrations of chemicals found in some of the monitoring wells on the site because it would be detrimental to their health. For example, toulene and xylene are not carcinogens. Benzene is. Some of the chemicals found on site have, what is called acceptable levels.

At Country Pond chemical compound levels are almost all below detection levels. 1.1.1-trichlorethane for example is non-detectable. Additionally, trichchloroethylene is at a point of no detection and methylene chloride is just below detection levels.

The concentrations observed in test wells in Country Pond do not constitute a substantial and imminent danger to human health and environment.

Water criteria is what concentration of chemicals people could be exposed to without having any long term effects; vinyl chloride, benzene, tetrachloroethylene, trichloroethylene and 1.1 dichloroethylene are organic chemicals found in concentrations in monitoring wells on site which have potential toxic effects associated with their ingestion. No one drinks out of the wells.

Vinyl chloride is capable of producing a number of toxicities which would depend upon the concentration and the length of exposure. It can produce a carcinogen as well as CNS depression, coma or liver injury. The acceptable concentration for vinyl chloride is two parts per billion. Some of the wells on and off the GLC and Ottati & Goss sites were 900 times higher than the acceptable two parts per billion limit.

Benzene is a widely used chemical in industry. It can cause CNS depression, aplastic anemia and leukemia. The acceptable standard for benzene is 0.66 parts per billion. The concentration of benzene has been fifty to seventy times greater than the acceptable limits on the Ottati & Goss and GLC sites.

1.1 dichloroethylene also known as vinylidine chloride is a chemical compound used in making synthetic chemicals. It can produce a number of toxicities. It can produce CNS depression, liver problems and cancer. The acceptable concentration is 0.003 parts per billion. Some well concentrations were 1,000 times higher than acceptable standards at the GLC and Ottati & Goss sites.

Trichloroethylene is a chemical whose major purpose in industry is for use as a degreasing agent. It can produce CNS depression at high concentrations in the range of 100,000 to 200,000 parts per billion and liver damage. It can produce cancer in animals and might produce cancer in humans although this is disputed. The acceptable concentration of this chemical is 2.7 parts per billion. It has been found to be 3,000 times higher than the acceptable concentration in some of the wells. It has been used in the manufacture of decaffeinated coffee.

Tetrachloroethylene is a solvent that is not very flammable. Its major use is in the dry cleaning industry. It can produce CNS depression, anesthesia, coma, liver injury and kidney injury. It can also produce cancer in laboratory animals. The acceptable concentration is 0.8 parts per billion. It has been found to be as much as 3,000 times higher than acceptable concentrations in some of the wells.

Additional chemicals have particular toxic effects.

Methylene chloride is used to remove paint and varnish. It can produce CNS depression and interfere with the oxygen-carrying capacity of the blood.

1.2 trans-dichloroethylene can produce CNS and liver injury.

1.1.1 trichloroethane can produce CNS. It can also sensitize the heart fibrillations and cause very severe heart problems.

1.2 dichloroprane can cause liver and kidney injury.

Ethyl benzene can cause CNS depression.

Styrene is an eye and skin irritant.

Toluene can produce narcosis or anesthesia.

Xylene can cause central nervous system depression and can be irritating to mucus membranes in the eyes, mouth, nose.

Chlorobenzene can cause central nervous system depression and liver injury. Acetone can be an irritant.

Acetone and methyl ethyl ketone can increase the toxicity of other chemicals.

Arsenic was found at various wells. Its toxic effects include diarrhea, dermatitis and dementia or brain injury. It also can cause cancer. The level for arsenic has been set at 0.0022 parts per billion. It has been found in some samples to be tens of thousands times higher than the acceptable concentration levels.

Nickel is used throughout industry for many different purposes. It can produce hyperglycemia and kidney injury.

### Contamination, Old Mill Road, North Brook And The Senter Property

Old Mill Road is southwesterly of the Ottati & Goss site. Several private residential wells were sampled. With one exception (heating oil spill, not germane to this case) the samples did not show the presence of contaminants. Surface water samples of South Brook west of the site near Old Mill Road do now show the presence of contaminants.

Sample locations at North Brook were at Route 125 and background. Methylene chloride 1–9 parts per billion, 1–2 dichloroethylene less than 1 part per billion and tetrachloroethylene 1–9 parts per billion were present in the sample.

Groundwater monitoring wells were drilled on the Senter property, northwest and westerly of the GLC property. Sampling of these wells showed the presence of groundwater contamination. 1.1 dichloroethylene was present, 1.1.1 trichloroethane 13 parts per billion, trichloroethylene 42 parts per billion.

Analysis of samples taken in November/December 1983, January/February 1984 and August 1984 also demonstrated the presence of volatile organic compounds in well P–1.

Monitoring well P–2, located east of well P–1, was sampled in August 1984. The following substances were present:

| | |
|---|---|
| trichloroethylene | Present |
| bromofrom | 13 parts per billion |

Monitoring well–15 was sampled in May 1981. The following substances were found:

| | |
|---|---|
| 1,2 trans-dichloroethylene | 12 parts per billion |
| tetrachloroethylene | 50 parts per billion |
| trichloroethylene | 13 parts per billion |

Analysis of samples collected in June 1982, September 1983, January/February 1984 and August 1984 demonstrated the presence of volatile organic compounds in the groundwater.

Monitoring well B–1 was sampled in January/February 1984. The following volatile organic compounds were found:

| | |
|---|---|
| 1,1 dichloroethane | 28 parts per billion |
| trans–1, 2-dichloroethylene | 12 parts per billion |
| 1,1,1 trichloroethane | Present |
| 1,1,1-tetrachloroethylene | Present |
| ethyl benzene | 13 parts per billion |

Volatile organic compounds were also found when the well was sampled in August 1984.

Monitoring wells–B–5A and B–5B were sampled in January/February 1984, the following volatile organic compounds were found:

| Well B–5A | trans–1,2–dichloroethylene | Present |
| | trichloroethylene | 105 Parts per billion |
| | 1,1,2,2,tetrachloroethylene | 49 "  "  " |
| Well B–5B | 1,1,2,2,  "  " | 20 "  "  . " |
| Well B–5B (duplicate) | 1,1,1 trichloroethane | Present |
| | trichloroethylene | Present |

The wells were sampled again in August 1984 and latile organic compounds were found in the sample taken on Well B–5 A.

Monitoring Wells GZ–9 and GZ–9a were sampled in January/February 1984. None of the substances analyzed for were found in Well GZ–9. The following substances were found in GZ–9A:

| 1,1 dichloroethane | Present |
| trans–1,2–dichloroethylene | Present |
| chloroform | Present |
| benzene | Present |
| ethyl benzene | 72 pts. per billion |

Volatile organic compounds were also found in Well GZ–9A when it was sampled in November/December 1983 and August 1984.

Well B–4A

| 1,1 dichloroethane | 26 parts per billion |
| trichloroethylene | Present |
| 1,1,2,2,tetrachloroethylene | Present |
| toluene | 16 parts per billion |
| ethyl benzene | 80 parts per billion |
| xylene | 68 "  "  " |
| trans–1,2 dichloroethylene | Present |

Well B–4B

| chloroform | 130 parts per billion |
| toluene | 1000 parts per billion |
| ethyl benzene | 470 "  "  " |
| xylene | 1080 "  "  " |

Well B–4B (duplicate)

| 1,1 dichloroethane | 88 "  "  " |
| 1,1,1 trichloroethane | Present |
| benzene | Present |
| toluene | 64 parts per billion |
| ethyl benzene | 331 "  "  " |
| xylene | 1126 "  "  " |

These wells were sampled again in August, 1984, volatile organic compounds were present in the samples collected from the wells at that time.

The Plumes, Marsh and Country Pond

The body of groundwater contamination emanating from a source is often referred to as a "plume" of contamination. A great amount of evidence, some of it conflicting, was introduced regarding plumes.

There is a groundwater plume of contamination originating from the general vicinity of the former location of the drum formation on the Ottati & Goss site.

When the contaminants leave the Ottati & Goss site, they move generally from the southwest towards the northeast and then parallel to North Brook and towards Route 125 and the marsh. It clips the northwest corner of the GLC site but not to any

appreciable degree. It does not flow into or under that part of the GLC site where contaminants have entered the groundwater such as the areas of the caustic lagoon, sawdust pile, incinerator or the Kingston Swamp.

A significant part of the contaminants in the plume originating in the vicinity of the drum formation on the Ottati & Goss site have been and will be trapped in the peat deposits in the swampy area along South Brook that is north and northeast of the Ottati & Goss site. Some contaminants will be discharged from the groundwater into South Brook.

The concentration levels of contaminants within the Ottati & Goss plume of contamination will diminish as the plume moves away from its source and toward North Brook as a result of various processes including the adsorption of part of it in the peat deposits of South Brook swamp, the discharge of some contaminants into South Brook, dilution or dispersion within the aquifer, volatilization and biodegradation.

Any contamination from the site where there is a discharge or runoff to a marshy area, said contaminants are exposed to the air. That is the best opportunity for volatilization to occur.

Dilution can also reduce the concentration of the contaminants many-fold.

Additionally, there is the process of biodegration. The compounds are organic; many have the ability to be decomposed by microorganisms. North Brook and South Brook or any surface water has generally higher micro-organism activity than does the aquifer or the groundwater system.

It is unlikely that contaminants from the Ottati & Goss site have moved easterly off Route 125 into the marsh area.

Approximately fifty percent (50%) of the contamination now east of Route 125, and of future migration of what is now west of Route 125, will be dissipated in dilution via surface water; thirty percent (30%) will move upward from the outwash sand and gravel below the marsh into the peat of the marsh where it will be slowly dissipated through natural processes, twenty percent (20%) will be dispersed under the peat without surfacing, and no measurable concentrations of these chemicals will enter the waters of Country Pond.

The only measurable concentrations of contaminants reported at Country Pond were in September of 1982 and not found thereafter. Those readings were transient, reflecting contamination probably caused by the EPA cleanup/crushing pit operation in May-July 1982 carried to the pond by the surface water of South Brook.

The contamination detected to the east of Route 125 originated at the KSD site as a result of the pre-IMC operations, the IMC operations and the GLC operations.

In November, 1980 sediment and surface water samples were taken from the marsh and Country Pond. The following substances were found in the center of the marsh. PPB stands for parts per billion.

| | |
|---|---|
| 1,1 dichloroethane | 23 PPB |
| 1,1,1 trichlorethane | 9 " |
| benzene | 4 " |
| toluene | 470 " |
| ethyl benzene | 140 " |
| chlorobenzene | 2 " |
| xylene | 290 " |
| acetone | Present |
| methyl ethyl ketone | Present |
| methyl isobutyl ketone | Present |

A sediment sample taken from the mouth of the brook approximately 3-meters upstream from Country Pond disclosed.

| | | | | |
|---|---|---|---|---|
| Tetrachloroethylene | 20 | parts | per | billion |
| Toluene | 30 | " | " | " |
| Chlorobenzene | 100 | " | " | " |
| Ethyl benzene | 400 | " | " | " |
| Xylenes | 20,000 | " | " | " |

A water sample taken in the same area as above showed tetrahydrofuran present.

A water sample taken in Country Pond approximately 30 meters from the brook disclosed 3 PPB of methylene chloride.

In April, 1982 EPA again sampled the marsh and Country Pond. A water sample in the marsh disclosed.

| | |
|---|---|
| 1,1,1 Trichloroethane | 2 parts per billion |
| Xylene | 2 " " " |
| Toluene | 2 " " " |
| Trichloroethylene | less than 1 pt per billion |
| Tetrachloroethylene | less than 1 pt per billion |
| Ethyl benzene | less than 1 pt per billion |

Sediment samples taken in the same location as above showed,

| | |
|---|---|
| Trichloroethylene | 8 pts per billion* |
| Trans–1,2–Dichloroethylene | 87 " " " * |
| 1,1 Dichloroethane | 110 " " " * |
| Toluene | trace |
| Acetone | trace |
| Xylene | trace |

*Approximation

In September, 1982 EPA again sampled the marsh and Country Pond. The following substances were found, all approximations (water at South Brook east of Route 125).

| | |
|---|---|
| acetone | 1200 pts. per billion |
| methyl ethyl ketone | 910 " " " |
| methyl isobutyl ketone | 30 " " " |
| tetrahydrofuran | 45 " " " |
| xylene | 24 " " " |
| 1,1,1,trichloroethane | 4 " " " |
| ethyl benzene | 35 " " " |
| toluene | 5 " " " |

Sediment sample taken at the western end of the marsh disclosed approximately 79 parts per billion of tetrachloroethylene.

EPA in December, 1982 sampled the marsh and Country Pond. A sediment sample taken from the Pond disclosed.

| | |
|---|---|
| 1,1 dichloroethane | 180 Parts per billion* |
| trichloroethylene | 110 " " " * |
| 1,2–dichloroethylene | 200 " " " * |
| xylene | 640 " " " * |
| chlorobenzene | 950 " " " * |
| toluene | 84 " " " * |
| tetrachloroethylene | 74 " " " * |
| benzene | 50 " " " * |
| trichloroethylene | 240 " " " * |
| 1,1 dichloroethane | 2900 " " " * |
| 1,2 dichloroethylene | 230 " " " * |

A water sample from Country Pond disclosed.

| | |
|---|---|
| 1,1,1 trichloroethane | 1 part per billion |
| toluene | 8 parts " " |
| ethylbenzene | 3 " " " |
| xylene | 12 " " " |

Once again in May, 1983 EPA sampled Country Pond and the marsh east of Route 125. Sediment samples taken from Country Pond disclosed.

| | |
|---|---|
| acetone | 630 pts per billion * |
| toluene | trace |
| 1,1 dichloroethane | 110 pts per billion * |
| trichloroethylene | 18 " " " * |
| benzene | 11 " " " * |
| toluene | 18 " " " * |
| chlorobenzene | 18 " " " * |
| 1,1 dichloroethane | 720 " " " * |
| 1,2 dichloroethylene | 36 " " " * |
| 1,2 dichloroethane | 36 " " " * |
| trichloroethylene | 40 " " " * |
| benzene | 100 " " " * |
| toluene | 13 " " " * |
| xylene | 42 " " " * |
| tetrahydrofuran | 1500 " " " * |

*Approximation

Water samples showed 2 PPB of toluene.

In January 1985 the State of New Hampshire sampled North Brook. The sample was taken from the marsh east of Route 125. The following substances were found:

| | | |
|---|---|---|
| 1,1 dichloroethane | 6.8 | pts per billion * |
| 1,2 dichloroethane | 5 | " " " * |
| benzene | 5 | " " " * |
| ethyl benzene | 17.7 | " " " * |
| toluene | 41.4 | " " " * |
| xylene | 73.7 | " " " * |
| acetone | 18.7 | " " " * |
| tetrahydrofuran | 26.8 | " " " * |
| methyl ethyl ketone | 10.2 | " " " * |
| methyl isobutyl ketone | 5 | " " " * |

* Approximation

Monitoring wells W–6, W–9, W–19, W–20 and W–21 were sampled on six occasions subsequent to 1981. In addition W–9 was sampled separately on one occasion. On each occasion total volatile organic compounds in excess of 90 ppb were found to be present in each of those wells.

Monitoring wells GZ–3 and GZ–4A, 4B and 4C, which are located in the western end of the marsh, were drilled in late 1983. These wells have been sampled four times since their installation. In addition, on one occasion only, GZ–4 was sampled. Volatile organic compounds have been found in the samples taken from these wells, including toluene, ethyl benzene, trichloroethylene, 1,1,1 trichloroethane and methylene chloride.

Monitoring wells GZ–5A, 5B and GZ–6 are located in the pond along its western boundary. These wells were drilled in late 1983. Volatile organic compounds have been found in each of these wells each time that they have been sampled except the August 1984 sampling of GZ–6.

Response Costs by The Government

EPA has to date incurred costs in inspecting and evaluating the Ottati & Goss site, the Great Lakes Container Corporation property and adjacent areas east and west of Route 125, in determining the presence of groundwater, surface water and sediment contamination at and emanating from the Ottati & Goss site, the Great Lakes Container Corporation property and adjacent areas, in monitoring that contamination and in conducting a remedial investigation and feasibility study.

EPA removed 4,468 drums from the Ottati & Goss site, including all of the drums on the site prior to EPA's involvement with the site and drums used during the overpacking and disposal activities. EPA also removed 3½ million pounds of hazardous waste and/or materials, 80 lab packs, and 275 cubic yards of contaminated materials.

The 275 cubic yards included contaminated sawdust around the dumpster and heavily contaminated soils beneath the dumpster.

GLC Failure to Apply For NPES Permit

An oil sheen and caustic water discharge were observed in December, 1982 coming out of the caustic wash room. This was during the cleanup by GLC employees. The discharge ran down the ditch along the eastern side of the GLC facility and into South Brook. The discharge was sampled and analyzed by EPA and found to be contaminated with various organic compounds. The soil sample taken at the point of discharge from the plant contained methylene chloride, 1,1,1 trichloroethane, trichloroethylene, benzene, ethyl benzene and xylene among other compounds. The water sample taken at the point where the discharge entered South Brook contained among other substances methylene chloride, trichloroethylene and xylene.

The State of New Hampshire never issued a Clean Water Act NPDES permit.

Activities of Bernard Senter

Bernard Senter knew that Ottati wanted to lease land from Senter Transportation Company in order to process chemical waste using a sawdust and lime mixture. Bernard Senter was told by Ottati that the State had no objection to his treatment process.

At the time that the lease was entered into, the State did not have any laws or regulations prohibiting this type of hazardous waste processing.

Bernard Senter, prior to signing the lease, had his attorney check on Ottati, his

treatment process and his dealings with the State.

State inspectors, from March 17, 1978, periodically inspected the Ottati & Goss site and generally, at least until the spring of 1979, found that Ottati & Goss conducted a reasonably clean operation.

Bernard Senter knew that Ottati & Goss, Inc. was intending to sell its business to Defendant French, and that Defendant French wanted to lease the Ottati & Goss site.

Bernard Senter knew after June 1, 1979 that Defendant French was using the Ottati & Goss site, but never entered into any agreement with French relative to a lease.

As soon as there was any indication that drums were accumulating on the site and that processing had stopped, Bernard Senter immediately took measures to try to correct the problem and prevent any further accumulation of drums.

Richard French and French Processing

■ Richard French has defaulted in this case. Regardless, the plaintiffs have by a preponderance of the evidence proved that French brought hundreds of drums on site commencing in July, 1979. Many of these drums were in a deplorable condition and French did nothing to alleviate the leaking condition of the drums that were leaking.

French was not a neophyte with regard to hazardous wastes or hazardous waste sites. He had prior to his involvement with the Ottati & Goss site been involved in untoward incidents involving hazardous wastes. His involvement in this case bordered on reckless and wanton conduct as he continued to bring on site as many drums as he could, regardless of their condition, for monetary gain.

The court finds French is liable.

The Senters and Concord Realty Trust

Some of the history of the involvement of the Senters and Concord Realty Trust with the dismissal individually of Sally E. Senter as a defendant has already been alluded to in this opinion.

Louis Ottati approached Bernard Senter requesting a lease of Senter's land to be used by him to process hazardous waste. Ottati told Bernard Senter that the treatment process was acceptable to the State of New Hampshire. The State of New Hampshire at this time did not have authority to approve or disapprove the treatment process.

Through counsel, Bernard Senter investigated Louis Ottati's assertions and treatment process.

On March 1, 1978 a lease agreement was entered into by Louis Ottati and Wellington Goss and Senter Transportation Company involving approximately one acre of land.

The lease provided the following clauses. The LESSEE shall not discharge any material liquid, solid or otherwise, onto or into the ground nor shall they use the premises for any purpose requiring regulation by the State, Federal or Local government, including but not limited to the EPA or State Water Supply and Pollution Control Regulations of the State of New Hampshire.

The LESSEE hereby agrees to comply with all federal, state and local regulations in regard to their activities on the leased premises. And shall not carry on any activities on the premises which are unlawful, improper, noisy or offensive or contrary to any said law, ordinance or regulation; said covenant to be read with the provisions of Paragraph 3 herein.

The above indicates a circumspect approach by Bernard Senter, but it is also indicative of an awareness in 1978 of a hazardous waste problem.

Subsequent inspections of the Ottati & Goss site by State of New Hampshire personnel indicated that the Ottati & Goss site was a generally clean area during the one year period of the lease. In June, 1979 Ottati & Goss sold out to French.

Bernard Senter attempted in June, 1979 to take remedial measures to alleviate conditions at the Ottati & Goss site. He requested Ottati to clean up the site, changed the lock on the gate to the entrance road,

also inserted a chain, sought and received advice of counsel and cooperated with EPA and state officials.

On July 3, 1979 the State of New Hampshire issued orders to cease and desist to Ottati, Goss and French. The Town of Kingston issued similar orders to the same individuals on July 30, 1979.

Senter, Goss, Ottati and French were sent letters directing them to remove contaminated soil by August 5, 1979.

Prior to this suit being filed on May 15, 1980, in April of 1980 Senter brought suit in Rockingham County Superior Court for the State of New Hampshire. Suit was brought against Ottati, Goss and French requesting removal of the drums and cleanup of the site. On June 2, 1980 an order was issued by the court requiring the complete cleanup of the site.

The court finds that Bernard Senter and Concord Realty Trust acted reasonably from the inception of their business relationship with Ottati & Goss to the present. Sally E. Senter has been dismissed as an individual defendant and had a passive role as a member of the Concord Realty Trust.

Standard of Liability

Hazardous Substances Releases, Liability Compensation, 42 U.S.C. § 9601(32) defines liable as follows.

" 'Liable' or 'liability' under this title [42 U.S.C.S. §§ 9601 et seq.] shall be construed to be the standard of liability which obtains under section 311 of the Federal Water Pollution Control Act [33 U.S.C. § 1321]."

In *United States v. Price*, 577 F.Supp. 1103 (D.N.J.1983) the court discussed the standard of liability applicable pursuant to § 106(a).

In analyzing the standard to be applied under § 106, we must first determine whether the section as drafted contains an independent definition of liability. Of the two courts that have heard actions under § 106(a), one applied the § 107 standards of liability. *United States v. Outboard Marine*, [556 F.Supp. 54 (D.Ill. 1982) ] and the other held that § 106 was substantive and contained its own stan-

dard. *United States v. Reilly Tar [and Chemical Corp.*, 546 F.Supp. 1100 (D.Minn.1982) ]. The court in *Reilly Tar* quoted the phrase 'the public interest and the equities of the case' and concluded that such language implied that Congress intended a standard similar to that used in federal common law nuisance actions. *See United States v. Reilly Tar, supra*, 546 F.Supp. 1100, 1113, n. 2.

The Reilly Tar interpretation is difficult to fathom given the result of *Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) where the Supreme Court held that federal common law of nuisance had been preempted in the area of water pollution due to the recent outbreak of complex legislation. *Milwaukee v. Illinois, supra*, 451 U.S. at 317–19, 101 S.Ct. at 1792–93. *See also United States v. Outboard Marine, supra.* A better reading of the statute was articulated by the court in *Outboard Marine* when it stated that 'Congress included this imminent hazard authority [§ 106] in its CERCLA design and it should be given effect.... Whatever the source of the substantive law to be applied in a 106(a) action, it is most probable that those who would be liable under Section 107 were intended to be liable in an action under 106(a) for injunctive relief.' *United States v. Outboard Marine, supra* at 57.

This court fully concurs with the result reached in *Outboard Marine* and in so holding, we include the following additional reasons for applying the standards set forth in § 107. The heading used for § 107, 'Liability' denotes an intention to have this section define liability for the entire act. This conclusion is reinforced by the fact that § 107 does not contain any qualifying language. Instead, it appears that Congress desired to use quite broad and unrestrained terminology. In this manner, § 107 sets forth standards of liability and associated defenses. Section 106(a) on the other hand, is quite vague and does not discuss any independent standards of liability with respect to

those parties coming within its coverage. As such, it appears that § 106(a) is dependent upon the substantive provisions explaining liability outlined in § 107.

557 F.Supp. at 1113.

This court follows the reasoning in *United States v. Price*, and *United States v. Outboard Marine*, realizing full well in some cases there may appear to be inequitable results.

Section 7003 of the Resource Conservation and Recovery Act, as amended by 42 U.S.C. 6973 (a) provides:

> Notwithstanding any other provision of this Act [§ 42 U.S.C. §§ 6901 et seq.], upon receipt of evidence that the past or present handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste may present an imminent and substantial endangerment to health or the environment, the Administrator may bring suit on behalf of the United States in the appropriate district court against any person (including any past or present generator, past or present transporter, or past or present owner or operator of a treatment facility who has contributed or who is contributing to such other handling, storage, treatment, transportation or disposal to restrain such person to take such other action as may be necessary, or both.

■ The elements of a claim under RCRA § 7003 are (1) handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste, (2) an imminent and substantial endangerment to health or the environment, (3) the persons contributing to such handling, storage, treatment or disposal and (4) relief.

Claim has been brought against all defendants except IMC pursuant to Section 7003 of RCRA, 42 U.S.C. § 6973 for the handling, storage, treatment, transportation or disposal of hazardous waste at the Ottati & Goss site. Another claim has been brought against GLC and IMC for the storage, handling and disposal of hazardous waste at the GLC site.

In *United States v. Price*, 523 F.Supp. 1055, 1073 (D.N.J.1981), discussing the legislative history of the act, the court stated:

> This legislative history reveals two noteworthy points: first, that Congress intended the phrase 'contributing to' disposal to be interpreted in a liberal, not a restrictive, fashion; and second, that Congress realized that past acts could presently be contributing to an endangerment and intended those acts to be within the ambit of the statute. *Id.* (citing S.Rep. No. 172, 96th Cong., 2d Sess. 5, reprinted in [1980] U.S.Code Cong. & Ad. News 5019, 5023. *See also United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1109 (D.Minn.1982).

■ Congress, by enacting 42 U.S.C. § 6973, intended to confer upon courts authority to grant affirmative equitable relief to the extent necessary to eliminate any risks posed by toxic wastes; § 6973 authorized the cleanup of a site, even a dormant one, if the action is necessary to abate a present threat to public health or environment. *United States v. Price*, 688 F.2d 204 (3rd Cir.1982).

Looking to definitions as set forth in 42 U.S.C. § 6903 (33):

> The term 'storage', when used in connection with hazardous waste, means the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste.

42 U.S.C. § 6903 (34), defines the term "treatment" when used in connection with hazardous waste, as follows:

> any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume. Such term includes any activity or processing designed to change the physical form or

chemical composition of hazardous waste so as to render it nonhazardous.

42 U.S.C. § 6903 (3) defines disposal as: the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

In *United States v. Price*, 688 F.2d at 211, is the following. The endangerment provisions

> have enhanced the courts' traditional equitable powers by authorizing the issuance of injunctions when there is but a risk of harm, a more lenient standard than the traditional requirement of threatened irreparable harm.

*Id.*

The term "imminent hazard" was defined in *Environmental Defense Fund v. EPA*, 465 F.2d 528, 535 (D.C.Cir.1972).

> 'An "imminent hazard" may be declared at any point in a chain of events which may ultimately result in harm to the public. It is not necessary that the final anticipated injury actually have occurred prior to a determination that an "imminent hazard" exists.'

*Id.* (quoting EPA Statement of Reasons Underlying the Registration Decisions, March 18, 1971).

■ Endangerment means a threatened or potential harm and does not require proof of actual harm.

The court has in its findings ruled that the Ottati & Goss and GLC sites have presented an imminent and substantial endangerment to health and to the environment.

Chemical compounds found at the Ottati & Goss and GLC sites are hazardous wastes. See Section 3001 RCRA; 42 U.S.C. § 6921; 40 C.F.R. part 261.31 and 33.

42 U.S.C. § 9606(a) provides that

(a) In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.

In *Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d 1, 13 (D.C.Cir.) (en banc), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976) the court in construing a provision of the Clean Air Act, 42 U.S.C. § 7603 *et seq.*, stated that [t]he meaning of 'endanger' is not disputed. Case law and dictionary definition agree that endanger means something less than actual harm. When one is endangered, harm is *threatened;* no actual injury need ever occur.

541 F.2d at 13 (emphasis in original).

It is linguistically clear, of course, that one can be 'endangered' without actually being harmed. Nonetheless, some risk of harm is necessary. *State v. Fine*, 324 Mo. 194, 23 S.W.2d 7, 9 (1929). Webster defines 'endanger' as 'to bring danger or peril of *probable* harm or loss.' Webster's Third New International Dictionary 748 (1961) (emphasis added).

541 F.2d at 13 n. 17.

### Burden of Proof

42 U.S.C.S. § 9607(a)(4)(A) provides,

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites

selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;

In *United States v. First City National Bank of Houston*, 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967), One question was whether the burden of proof is on the defendant banks to establish that an anticompetitive merger is within the exception of 12 U.S.C. § 1828(c)(5)(B) or whether it is on the Government. The court thought it plain that the banks carry the burden. That is the general rule where one claims the benefits of an exception to the prohibition of a statute. *Federal Trade Commission v. Morton Salt*, 334 U.S. 37, 44 [68 S.Ct. 822, 827, 92 L.Ed. 1196].

42 U.S.C. 9607(a)(4)(B) and (C) also provides that,

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.

■ The defendants thus have the burden of proof to show that the costs which the United States incurred are inconsistent with the National Contingency Plan.

### Joint and Several Liability

The plaintiffs take the position that the responsible defendants' liability is joint and several and indivisible. Some of the defendants contest this premise and while denying liability claim that if found liable, the liability is de minimus and divisible.

The issue of joint and several liability is not a novel one and has been addressed by several courts in the past. *United States v. Chem-Dyne Corp.*, 572 F.Supp. 802 (S.D. Ohio 1983) addressed the issue in a pristine, concise manner with the following comments.

This case, as do most pollution cases, turns on the issue of whether the harm caused at Chem-Dyne is 'divisible' or 'indivisible'. If the harm is divisible and if there is a reasonable basis for apportionment of damages, each defendant is liable only for the portion of harm he himself caused. Restatement (Second) of Torts, §§ 443A, 881. In this situation, the burden of proof as to apportionment is upon each defendant. *Id.* at § 433B. On the other hand, if the defendants caused an indivisible harm, each is subject to liability for the entire harm. *Id.* at § 875. The defendants have not carried their burden of demonstrating the divisibility of the harm and the degrees to which each defendant is responsible.

572 F.Supp. at 811.

An examination of the common law reveals that when two or more persons acting independently caused a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused. Restatement (Second) of Torts, §§ 433A, 881 (1976); Prosser, Law of Torts (4th ed. 1971), pp. 313–14; *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 260, 99 S.Ct. 2753, 2756, 61 L.Ed.2d 521 (1979); *See, Michie v. Great Lakes Steel Division, National Steel Corp.*, 495 F.2d 213 (6th Cir.1974); *See, e.g., City of Valparaiso v. Moffit*, 12 Ind.App. 250, 255, 39 N.E.909 (1895) (two independent polluters of a stream, although not joint tortfeasors, are jointly and severally liable for damages). But where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm. Restatement (Second) of Torts, § 875; Prosser at 315–16. Furthermore, where the conduct of two or more persons liable under § 9607 has combined to violate the statute, and one or more of the defendants seeks to limit his liability on the

ground that the entire harm is capable of apportionment, the burden of proof as to apportionment is upon each defendant. *Id.* at § 433B; *Id.* These rules clearly enumerate the analysis to be undertaken when applying 42 U.S.C. § 9607 and are most likely to advance the legislative policies and objectives of the Act.

572 F.Supp. at 810.

■ The burden of proof is upon the defendants to establish that a reasonable basis exists for apportioning the harm amongst them rather than imposing joint and several liability. *United States v. Wade,* 577 F.Supp. 1326, 1338–39 (E.D.Pa. 1983).

(2) Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.

(quoting Restatement (Second) of Torts § 433B(2) at 441 (1965)).

■ The evidence is that the various drums brought to the Ottati & Goss site were subject to the mixing operation. Chemical substances leaked, spilled or otherwise came into contact with the ground and were mixed together. Some of these substances were transported onto the surface water and some went into the groundwater. Volatile organic compounds which were determined to be identical to the known constituents of each generators' waste were found in the groundwater.

Defendant Lilly shipped approximately 670 drums of waste; General Electric approximately 458 drums of waste; SRS approximately 5962 drums of waste; Lewis Chemical between 732 to 900 drums of waste and GLC between 500 to 700 drums of waste. French also brought on site an unknown, but substantial amount of waste drums.

Although Lilly, General Electric and Lewis Chemical have met the burden of proof as to approximately how many drums were brought onto the Ottati & Goss site,

their liability is joint, several and indivisible.

According to the circumstances and facts of this case, the exact amount or quantity of deleterious chemicals or other noxious matter cannot be pinpointed as to each defendant. The resulting proportionate harm to surface and groundwater cannot be proportioned with any degree of accuracy as to any individual defendant.

Defendants' liability is joint, several and indivisible.

Do Sections 104 and 105 Require the EPA to Provide Responsible Parties with Prior Notice and Opportunity to Participate in the Cleanup Before It May Incur Recoverable Response Costs

■ The evidence is uncontroverted that EPA was aware of the Ottati & Goss generators at least by September 22, 1980. Further, the government has stipulated that EPA failed to provide the generators with any prior notice or opportunity to conduct their own cleanup activities at the Ottati & Goss site.

It is the generators' contention that the government has not satisfied a basic statutory prerequisite for a cost recovery action under Section 107(a) of CERCLA and may not hold the Generators liable for any response costs incurred after it learned of the Generators' identities.

According to 42 U.S.C. § 9604(a)(1) the EPA may take response activity at a site with the added provision that if the EPA "determines that such removal and remedial action will be done properly by the owner or operator of the vessel or facility from which the release or threat of release emanates, or by any other responsible party", it may do so.

A decision by EPA to conduct a response action at plaintiff's facility constitutes a "final" administrative action that is subject to judicial review. Once the EPA carries out the contemplated response action, plaintiffs become potentially liable for the funds expended. The only way plaintiffs can avoid this potential liability is to chal-

lenge the response action before it is conducted. *J.V. Peters & Co., Inc. v. Ruckelshaus,* 584 F.Supp. 1005 (N.D.Ohio 1984). In *Ruckelshaus,* current and former owners and operators of an industrial waste facility were seeking to prevent the EPA from undertaking a CERCLA response action at their facility. The court in *Lone Pine Steering Committee v. EPA,* 600 F.Supp. 1487, 22 ERC 1113 (D.N.H.1985) stated:

> Congress enacted CERCLA in 1980 in response to increasing concern over the severe environmental and public health effects from improper disposal of hazardous wastes and other hazardous substances. The difficulty in responding quickly to environmental pollution problems resulting from spills of hazardous chemicals and abandoned waste sites, posed a major problem. While EPA had some authority under other statutes to bring suit to require cleanups, it generally lacked the authority and the funds either to conduct itself or to compel private parties to conduct cleanup actions in response to environmental hazards. *See generally United States v. Price,* 577 F.Supp. 1103, 1109 (D.N.J.1983).
>
> CERCLA was particularly designed to address these problems by giving EPA the authority and the funding to take or require immediate cleanup actions without the need for a prior determination of liability. *See* S.Rep. No. 96–848, 96th Cong., 2d Sess. (1980), 10–12, *reprinted in 1 Comm. on Environmental and Public Works. A Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, at 317–19 (1983).*

*Lone Pine Steering Committee,* 600 F.Supp. at 1489. 22 ERC at 1114–15.

> On July 6, 1982 EPA sent 'notice' letters to fourteen companies informing each one that it 'may be a responsible party with respect to the release and threatened release' of hazardous substances from the Lone Pine site.

. . . . .

> EPA requested each company to perform a feasibility study evaluating remedial alternatives for the landfill and other response activities. . . .
>
> No private party committed itself to undertake the work. . . .
>
> September 12, 1984, EPA sent notice letters to 142 companies.

*Id.* 600 F.Supp. at 1491–92, 22 ERC at 1117.

The court also stated that the option under Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1) is with the EPA to do one of the following. The EPA can take curative action consistent with the National Contingency Plan,

> '*unless* EPA determines that such removal and remedial action will be done properly by the owner or operator ... of the facility from which the release or threat of release emanates, or by any other responsible party.'

*Lone Pine Steering Committee v. EPA,* 600 F.Supp. at 1490, 22 ERC at 1115 (citing 42 U.S.C. § 9604(a)(1) ).

The issue presented appears to be one of first impression as this case has been fully litigated on the issue of liability.

While recognizing that the EPA in retrospect should have given the generators an opportunity to take remedial action, it does not obviate the EPA to seek recovery of its costs in the damage aspects of this trial. In this regard, the generators can introduce such evidence as may be available which may mitigate damages alleged.

The purpose of CERCLA as evidenced by the intent of Congress is to have EPA act quickly to remedy environmental problems posed by hazardous waste sites.

Retroactive Application of the Comprehensive Environmental Response, Compensation, and Liability Act, (CERCLA)

▪ The defendants contend that the imposition of liability under CERCLA § 106 and § 107 for previously lawful conduct which occurred before CERCLA became effective on December 10, 1980 violates constitutional due process requirements.

In *United States v. Stringfellow,* 20 ERC 1912, 1914 (C.D.Cal.1984) the court

reiterated the well-settled rule concerning the retroactive application of legislation:

There is a strong presumption against retroactive construction of statutes. *United States v. Heth*, 7 U.S. (3 Cranch) 399 [2 L.Ed. 479] (1806). However, when it is clear that Congress intended the statute to be applied retroactively, that presumption may be overcome. *Id.* at 413.

20 ERC at 1914.

In *United States v. Shell Oil Co.*, 605 F.Supp. 1064, 1072 (D.Colo.1985) the court stated that based upon CERCLA's predominant scheme and purpose:

[c]ourts have had no difficulty in imposing liability on responsible parties for acts committed before enactment. *United States v. South Carolina Recycling and Disposal Inc.*, 20 E.R.C. 1753 (D.S.C. February 23, 1984); *United States v. Conservation Chemical Co.*, 589 F.Supp. 59 (W.D.Mo.1984); *United States v. Northeastern Pharmaceutical and Chemical Co.*, 579 F.Supp. 823; *United States v. A&F Materials Company, Inc.*, 578 F.Supp. 1249 (S.D.Ill.1984); *United States v. Price*, 577 F.Supp. 1103 (D.N.J.1983); *State of Ohio ex rel. Brown v. Georgeoff*, 562 F.Supp. 1300; *United States v. Outboard Marine Corp.*, 556 F.Supp. 54 (N.D., Ill.1982) 1100; *Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100 (D.Minn.1982); *United States v. Wade*, 546 F.Supp. 785 (E.D.Pa. 1982) (off-site generators of wastes disposed of before CERCLA's enactment liable under § 107 but not under § 106).

605 F.Supp. at 1072.

Recently, several courts have held that retroactive application of CERCLA § 107(a) to pre-CERCLA enactment activities does not violate due process requirements. *Shell Oil Co.*, 605 F.Supp. at 1072 (citing *United States v. South Carolina Recycling and Disposal Inc.*, 20 ERC 1753, 1761–62 (D.S.C.1984); *United States v. Northwestern Pharmaceutical and Chemical Co.*, 579 F.Supp. 823, 840–41 (W.D.Mo. 1984) ).

The court in *Shell Oil* found that CERCLA was enacted to specifically deal with the deterioration of the environment due to hazardous waste dumping that occurred in the past. In reference to CERCLA the court said:

It is by its very nature backward looking. Many of the human acts that have caused the pollution already had taken place before its enactment; physical and chemical processes are at their pernicious work, carrying destructive forces into the future.

*Shell Oil Co.*, 605 F.Supp. at 1072.

The defendants in the present case also challenge the retroactive application of CERCLA § 106 which holds responsible parties liable for the government's response costs incurred before CERCLA's enactment. The federal district courts differ as to whether a retroactive application of Section 106 is constitutional. Reference is made to *United States v. Wade*, 546 F.Supp. 785, 793–94 (E.D.Pa.1982) which holds Section 106 does not apply retroactively to non-negligent off-site generators. However, this court, now presiding, agrees with those districts such as the District of Colorado which hold Section 106 may be applied retroactively. This court adopts the reasoning and ruling stated in *United States v. Shell Oil Co.*

[T]he unavoidably retroactive nature of CERCLA, and Congress' decision in CERCLA to impose the cost of cleaning up hazardous waste sites on the responsible parties rather than on taxpayers, strongly indicate Congressional intent to hold responsible parties liable for pre-enactment government response costs. Such a Congressional intent is consonant with the law's underlying precept that holds parties responsible for damage they cause.

*Shell Oil Co.*, 605 F.Supp. at 1073.

The facts in *Shell Oil* present a situation where the government sought both pre and post CERCLA enactment response costs. *Id.* at 1067. Since 1947, the United States Army leased certain property within the Rocky Mountain Arsenal (Arsenal) to Shell

Oil Co. Both the Army and Shell Oil Co. disposed of all or some of their wastes through a common sewer system and common contaminated waste disposal system built and operated by the Army. *Id.* The system failed and their combined hazardous substances were released into the environment. As a result, birds, fish and wildlife were killed and air, land, groundwater, lakes and other surface waters in and outside the Arsenal boundary were contaminated or threatened with contamination. *Id.*

In 1975 the State of Colorado issued administrative orders to the Army and Shell telling them to cease and desist certain discharges, to institute a clean up and to institute a groundwater monitoring program. At this time, the Army began an investigation coupled with testing to ascertain the existence, extent and sources of contamination at the Arsenal. *Id.* The Army also started a response action to prevent and control the spread of chemical contamination off the Arsenal property and to avoid exposing the public to these dangers. *Id.* During 1982, additional response actions were planned and implemented by the Army in conjunction with the EPA, the State of Colorado and Shell Oil Co. By December 1, 1983, The Army incurred approximately $48,000,000. in response costs. *Id.* at 1068. The court concluded that there was no constitutional bar to holding Shell Oil, a responsible party,. liable for pre-CERCLA response costs. *Id.* at 1077.

In the present case, the defendants' hazardous waste disposal activities took place in 1978 and 1979. The EPA filed the original complaint on May 15, 1980 and commenced clean up procedures and site security in December, 1980. The EPA clean up terminated several years later. Based upon all the above information, this court rules that the retroactive application of CERCLA Sections 106 and 107 does not violate constitutional due process requirements.

### The Application Of Section 7003 To Inactive Waste Disposal Sites

The plaintiffs and more particularly the United States contends that Section 7003 makes no distinction between active and inactive disposal sites.

The court on December 2, 1980 did issue a temporary restraining order against the then defendants with regard to the Ottati & Goss site.

The gist of the motion for preliminary injunction basically was to have immediate remedial action concerning the potential hazards of chemicals and other waste materials on site.

In addition to a cease and desist order, the defendants were ordered to formulate a plan for the removal of all solid and hazardous waste from the Ottati & Goss site. They were also ordered to formulate a site security plan, said plans to be submitted for approval to the United States Environmental Protection Agency (EPA) and the State of New Hampshire.

At the time of the issuance of this order on December 2, 1980 the Ottati & Goss site was inactive.

The court finds that Section 7003 can be used for remedial action involving inactive sites.

42 U.S.C. § 6903(3) defines disposal as follows:

"The term 'disposal' means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwaters."

The definition of "disposal" is quite broad. "[S]ignificantly, it includes within its purview leaking, which ordinarily occurs not through affirmative action but as a result of inaction or negligent past actions." *United States v. Price*, 523 F.Supp. 1055, 1071 (D.N.J.1981). *See also United States v. Waste Industries, Inc.*, 734 F.2d 159 (4th Cir.1984).

By its plain language, the statute authorized relief restraining further disposal, i.e., leaking of hazardous wastes from the landfill into the groundwater. *United States v. Vertac Chem. Corp.*, 489 F.Supp. 870, 884–85 (E.D.Ark.1980).

The court in *United States v. Solvents Recovery Service of New England, et al.*, 496 F.Supp. 1127, 1141 (D.Conn.1980) stated:

> Section 7003 is designed to provide the administrator of [EPA] [of ERA] with overriding authority to respond to situations involving a substantial endangerment to health or the environment, regardless of other remedies available through the provisions of the Act ....

*Id.* (citation omitted).

Imminence in this section applies to the nature of the threat rather than identification of the time when the endangerment initially arose. The section, therefore may be used for events which took place at some time in the past but which continue to present a threat to the public health or environment.

Congress on November 8, 1984 revised the language of Section 7003 as follows:

> "... *past or present* handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste."

In *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100 (D.Minn.1982) the court stated:

> Although Reilly Tar no longer engages in ongoing activities at the site, this is no basis for dismissing the action. Other courts have held that a complaint based upon section 7003 need not contain an allegation of ongoing acts of disposal. *United States v. Solvents Recovery Service of New England*, 496 F.Supp. at 1139–41.

*Reilly Tar*, 546 F.Supp. at 1108.

### Liability of Defendants Under Section 7003

Defendant generators contend that § 7003 like CERCLA only provides for equitable, not compensatory relief. The court

in this bifurcated trial refuses at this time to address plaintiff, United States' claim under Section 7003 for reimbursement of expenses incurred by it in this action.

■ The court concurs with the opinion expressed in *Jones v. Inmont Corp.*, 584 F.Supp. 1425 (S.D.Ohio 1984) that past off-site generators may be liable under Section 7003. The issue of non-negligent past conduct will be addressed later.

■ Addressing the issue of the liability of IMC as a prior owner of the GLC site under Section 7003, the court rules.

Generally, IMC was circumspect concerning the operation of its drum reconditioning plant. There is evidence that employees of IMC at the request of supervisory personnel did commit untoward acts such as the burial of drums which contributed to the environmental problem at the GLC site.

This court concurs with the reasoning of the district court in *United States v. Price*, 523 F.Supp. 1055 (D.N.J.1981) that prior owners of the landfill in that case were proper defendants notwithstanding their sale of the property.

Following the same reasoning, Bernard Senter and the Concord Realty Trust are held liable.

### Does Section 7003 impose Liability Without Regard to Negligence?

■ The United States contends that negligence need not be alleged or proved to establish liability under Section 7003. Further, that it is the contribution to an action which subjects a person to liability, not the degree of care exercised in that contribution.

In *United States v. Hardage*, 18 ERC 1685 (W.D.Okla.1982) the court found,

> that the plain meaning of the statute [§ 7003 of RCRA] is to confer liability upon any person contributing to the handling, storage, treatment, transportation, or disposal of a solid or hazardous waste where such activity may present an imminent and substantial endangerment to the health or to the environment without regard to fault. It would be improper to

read a negligence standard into the statute, not only because of the plain language of the statute but because of the hazardous nature of the activity involved.

*Id.* at 1686. Regarding this issue see The Hazardous and Solid Waste Amendments of 1984, Pub.L. 98–616; § 402, 98 Stat. 3221 (1984); S.Rep. No. 98–284, 98th Cong.; 1st Sess. (1983) at 58; H.R.Rep. No. 98–198, 98th Cong., 1st Sess. (1983) at 47–48, U.S.Code Cong. & Admin.News 1984, 5576, 5606, 5607.

### Joint and Several Liability Under Section 7003 Where the Harm is Indivisible

On this issue the court's ruling is the same or consonant with its previous ruling that joint and several liability shall be applied.

"[W]here the conduct of two or more persons liable under CERCLA has combined to violate the statute, and one or more of the defendants seeks to limit his liability on the ground that the entire harm is capable of apportionment, the burden of proof as to apportionment is upon each defendant." *United States v. Conservation Chemical Co.*, 589 F.Supp. 59, 63 (W.D.Mo.1984).

### Claim Under Section 309 of Clean Water Act Against Great Lakes Container Corporation

■ "Congress by defining the term 'navigable waters' in Section 502(7) of the Federal Water Pollution Control Act Amendments of 1972, 86 Stat. 816, 33 U.S.C. § 1251 *et seq.* (the 'Water Act') to mean 'the waters of the United States, including the territorial seas,' asserted federal jurisdiction over the nation's water to the maximum extent permissible under the Commerce Clause of the Constitution. Accordingly, as used in the Water Act, the term is not limited to the traditional tests of navigability." *National Resources Defense Council, Inc. v. Callaway*, 392 F.Supp. 685, 686 (D.D.C.1975).

Evidence was presented that waste materials which included methylene chloride, trichloroethane and toluene were discharged into a ditch on GLC's property and from there into South Brook and ultimately into a navigable water.

A NPDES permit was never issued by the State of New Hampshire to any of the predecessors in title to the GLC site or to GLC itself.

The discharge on December 1, 1982 did violate Section 301(a).

### Proximate Cause and the Generator Defendants

■ Recently several courts have stated that the standard of liability under Section 107(a) of CERCLA, 42 U.S.C. § 9067(a)(1–4) is a strict one. *United States v. South Carolina Recycling and Disposal, Inc.*, 20 ERC 1753, 1756 & n. 2 (D.S.C.1984) [hereafter SCRDI]. The burden of proof is defined and limited to the express terms of the statute. The statute states in unequivocal terms that a generator may be held liable under Section 107(a):

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

.    .    .    .    .

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances ... from which there is a release, or threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan ....

42 U.S.C. § 9607(a)(3). In *United States v. SCRDI*, 20 ERC 1753, 1756 (D.S.C.1984), the court stripped away the excess language to reveal the basic elements the government needs to prove under the above statute:

a. The generator's hazardous substances were, at some point in the past shipped to a facility.

b. The generator's hazardous substances or hazardous substances like those of the generator were present at the site.

c. There was a release or threatened release of a or any hazardous substance at the site.

d. The release or threatened release causes the incurrence of response costs.

*Id.* at 1756.

According to recent accepted interpretations of CERCLA this is all the government needs to prove. Section 107(a) does not require the government to match the waste found to each defendant as if it were matching fingerprints. *See United States v. SCRDI* 20 ERC at 1756; *United States v. Wade*, 577 F.Supp. 1326, 20 ERC 1277, (E.D.Pa.1983). To do so would be to defeat the purpose of the statute.

The purpose of this statute has been clearly expressed and reaffirmed by this District's court:

In enacting CERCLA in 1980, Congress sought to provide the federal government immediately with tools necessary for prompt and effective response to the nationwide threat posed by hazardous waste disposal and to impose the costs and responsibility for remedial action upon the persons responsible for the creation of the hazardous waste disposal threat. *United States v. Reilly Tar and Chemical Corp.*, 546 F.Supp. 1100, 1110, 1112 (D.Minn.1982). Given the remedial nature of CERCLA, its provisions should be afforded a broad and liberal construction so as to avoid frustration of prompt response efforts or so as to limit the liability of those responsible for clean-up costs beyond the limits expressly provided. *Id.*

*United States v. Mottolo*, 605 F.Supp. 898, 902 (D.N.H.1985).

In both *SCRDI* and *Wade,* the issue of causation was fairly dissected. Each court determined that specific proof of causation was not intended by the direct language of the statute. These opinions are firm in their conviction that Congress did not intend to impose an impossible burden of causation on the government. "The only required nexus between the defendant and the site is that the defendant have dumped his waste there and that the hazardous substance found in the defendant's waste are also found at the site." *United States v. SCRDI*, 20 ERC at 1757 (quoting *United States v. Wade*, 577 F.Supp. at 1333, 20 ERC at 1281).

The statute provides defendants with limited affirmative defenses under Section 107(b)(1), (2), (3) and (4). Under this section, defendant can avoid liability if he proves by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting were caused solely by:

(1) ) an act of God; (2) an act of war; (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or (4) or any combination of the above.

42 U.S.C. § 9607(b).

In the present case, the defendant generators have not raised any of the above defenses. In fact they did not deny that they did dispose of hazardous waste at the Ottati & Goss site. Instead, defendant generators argue that they should be held liable only for the harm caused by the presence of their waste. They argue that

if their drums were not on the site and not actually removed by the EPA then they are not liable.

Defendants contend that satisfying the four elements of Section 107(a) provides the plaintiff with a prima facie case. Defendant maintains that the government still bears the burden of proof and defendant bears only the burden to rebut the presumption of the prima facie case.

Citing footnote 6 in *United States v. SCRDI*, defendants claim the above cases do not deal with the burden of proof, except for the reference in the footnote allowing generators to avoid liability by proving that their wastes were removed from the site prior to the EPA arrival.

Footnote 6 was written in reference to the evidence, which showed that the samples taken by the government at the site matched the hazardous waste there to the kind delivered by the generators. *See United Stats v. SCRDI*, 20 ERC at 1757. However, the court said the government did not always have to duplicate the extensive sampling and analysis used in the cleanup in future cases. *Id.* at 1757. The court goes on to state that alternative, less exhaustive means of showing a particular generator's waste or similar waste is at a site will also satisfy the burden of proof. *Id.* at 1757 n. 6. These methods include (1) identification of a generator's drums at the site during cleanup; (2) by way of documentary or circumstantial proof that the wastes were hauled to the site absent proof that they were subsequently taken away. *Id.* at 1757 n. 6.

Defendant generators contend in their proposed findings of fact (# 918) that the waste sent was processed and removed by SCA monthly from March, 1978 through April, 1979. However, this court has found through a preponderance of evidence in this case that a large number of drums still remained on site at the time of the EPA's involvement in early 1980. In effect, defendant generators have failed to rebut that all their drums were removed before the EPA incurred the cost of cleaning the site. Under CERCLA, there is no allow-ance for leaving "some" or a "few" drums; the statute holds liable and penalizes anyone who left hazardous waste on the site where such waste was or had to be removed by the government. 42 U.S.C. § 9607(a).

Defendants contend that the interpretation of § 311 liability as applied in § 107(a) is to be determined by common law principles. Defendants cite *Stringfellow*, 20 ERC 1905 (C.D.Cal.1984) to uphold this view. Although a reading of *Stringfellow* reveals such an interpretation, it does not address the issue of causation as defendants assert it does. The main discussion of *Stringfellow* is the issue of joint and several liability and whether CERLCA intended to impose such a standard on the "scope" of liability. The opinion states that the movants (defendants) concede that the CERCLA standard of liability derived from Section 311 is strict. *United States v. Stringfellow*, 20 ERC at 1907 n. 4. This court has already made a determination relative to the scope of liability and the *Stringfellow* argument does not pertain to the present issue.

Contrary to defendant's assertion, the court in *United States v. Argent*, 21 ERC 1356, 1357 (D.N.M.1984) held as a matter of law that CERCLA's incorporation in § 101(32) of the § 311 standard of liability requires a strict liability standard. The invocation of traditional and evolving principles of tort law to the cause in fact arose in *Argent* during the discussion of the scope of liability and in particular, whether joint and several liability should be imposed. *Id.* at 1357.

Defendant generators also rely on *United States v. Tex-Tow, Inc.*, 589 F.2d 1310 (7th Cir.1978) (hereafter Tex-Tow) to argue that proof of causation in fact (that defendant's hazardous material caused the injury) is required even though § 311 is a strict liability provision.

*Tex-Tow* was an action under the Federal Water Pollution Control Act (FWPCA), which was enacted to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. 33 U.S.C.

§ 1251(a). The particular focus of Tex-Tow is § 1321(b)(6). This section makes owners and operators of vessels, onshore, offshore facilities liable for a civil penalty of up to $5,000.00 with no provisions for any defense. The Coast Guard determines the amount of the penalty in each case.

The goal of the FWPCA is to eliminate all pollutants in navigable waters by 1985. Tex-Tow argued a causation requirement must be implied in the civil penalty provision because no liability may exist in the absence of causation. *Tex-Tow*, 589 F.2d at 1313. The court agreed and stated causation is required under a strict liability statute. Tex-Tow conceded that its barge was at the pier during the oil spill and was a cause in fact. *Id.* at 1313–14. However, Tex-Tow argued that its mere presence was not sufficient to make them the legal cause. *Id.* at 1314.

The court found that Tex-Tow had more than "mere presence" and held them liable:

> Tex-Tow was engaged in the type of enterprise which will inevitably cause pollution and on which Congress has determined to shift the cost of pollution when the additional element of actual discharage is present.

*Id.* at 1314. The court found that the requirements of cause in fact and proximate or legal cause were satisfied when the actual pollution was joined with the statistically foreseeable pollution attributable to this type of defendant, namely owners/operators of any vessel, on/off shore facility which pollutes navigable waters. Finally, the court said:

> [f]oreseeability both creates legal responsibility and limits it. An enterprise such as Tex-Tow engaged in the transport of oil can foresee that spills will result despite all precautions and that some of these will result from the acts or omissions of third parties. Although a third party may be responsible for the immediate act or omission which 'caused' the spill, Tex-Tow was engaged in the activity or enterprise which 'caused' the spill.

*Id.* at 1314.

In the present case it is undisputed that the defendant generators did deposit numerous drums of hazardous waste at the Ottati & Goss site. As with *Tex-Tow*, the generators here engaged in an activity which encompasses a high risk of pollution and did in fact cause substantial pollution to soil and water. Similar to the *Tex-Tow* situation, Congress sought to shift to those responsible for the discharge the burden of the cost of pollution when the element of actual discharge is present. However, in CERCLA Congress was even stricter, by holding generators liable for both *actual* and *threatened* discharges of any hazardous substances which resulted in the government's incurring clean-up costs. The evidence to date shows that the drums left at the site by the generators did cause damage and there was great cost incurred in removing the drums.

Following the *Tex-Tow* analysis, enterprises such as the generator defendants, engaged in the disposal and treatment of hazardous waste, can foresee that releases of waste can occur and some releases will result from the acts and omissions of third parties. Under this analysis, even if a third party is responsible for the immediate act or omission which "caused" the release, the generators will still be deemed to be the "cause" of the release. *See Tex-Tow*, 589 F.2d at 1314.

Finally, it should be noted that proximate cause " 'serves as a means by which courts are able to place practical limits on liability as a matter of policy.' " *Herman v. Welland Chemical, Ltd.*, 580 F.Supp. 823, 827 (M.D.Pa.1984). (quoting *Wisniewski v. Great A & P Tea Co.*, 226 Pa.Super. 574, 581, 323 A.2d 744 (1974) ). The liability under Section 107(a) is broad and as such the limits of proximate cause are expanded to meet the requirements of the statute. *See*, e.g., *United States v. Wade*, 577 F.Supp. 1326, 20 ERC 1277, 1280–81 (E.D.Pa.1983); *United States v. SCRDI*, 20 ERC 1753, 1757–58 (D.S.C.1984).

A sampling of the voluminous facts indicates that these generator defendants sent at the minimum the following hazardous waste to the Ottati & Goss site:

Defendant Quinn sent 64 drums and or pails between January 24, 1979 and April 18, 1979. A partial list of the substances delivered includes xylene, methyl ethyl ketone, toluene, diisocyonate, and acetone.

General Electric sent 456 drums commencing on March 6, 1978 until April 18, 1979. A partial list of substances includes acetone, isopropanol, xylene, butanol.

Defendant Lilly sent 670 drums between May 24, 1978 and January 24, 1979. A partial list of substances includes toluene, acetone, methyl ethyl ketone, xylene, methyl isobutyl ketone.

Defendant Lewis Chemical sent 732 drums, between February, 1979 and July 1979. Partial list includes methylene chloride, 1.1.1 trichloroethane, toulene, methyl ethyl ketone, methyl isobutyl ketone

Defendant SRS sent 30 drums monthly between March, 1978 to May, 1979. A partial list includes tetrachloroethane, 1.1.1 trichloroethane, toulene, methyl isobutyl ketone, xylene.

The evidence in this case established that between May, 1978 to May, 1979 at least 6,900 drums were sent to the Ottati & Goss site. The drum processing started to backlog, liquids were leaking from the dumpsters used to haul the drums away. Many of the drums were leaking or did not have tops or bungs. By winter, 1979, conditions exacerbated, soil became discolored, drums continued to leak and to deteriorate. The EPA moved in to remove the waste drums on/or about May 21, 1982 and completed its onerous task on or about July 7, 1982. The EPA sampled the drums in April, 1980. The site was a fire hazard until the drums were staged by the EPA. The site was deemed a substantial and imminent danger to public health. Over one hundred drums were found to have PCB's; 3,965 drums contained hazardous contents. See p. 24–26 of Findings of Facts for details on the imminent danger to public health. See pages 72–77 for response cost incurred.

The above evidence makes it pristine that the plaintiffs have met the evidentiary elements of § 107(a). Based on the evidence and the previous dissertation, it is the opinion of this court that the defendant generators are liable under Section 107(a) for the harms incurred at the Ottati & Goss site.

### Proximate Cause and Defendants IMC and GLC

▪ Applying Section 107(a) to the Great Lakes Container Corporation site (GLC) the result is clear. The statute definitely applies to the owner and operators of a facility where hazardous substances were disposed. 42 U.S.C. § 9607(a)(2). Each of the GLC site defendants owned or operated the facility at the time of disposal of some hazardous substances. A close analysis of the facts demonstrates that there was a release or a threatened release of hazardous substances which caused the incurrence of response costs. As stated above, the standard under Section 107(a) is strict liability. While there may have been some questions concerning proximate cause as to the liability of generators, these questions are more easily dispensed with in connection with the GLC site defendants.

Liability of a landowner was discussed in *United States v. SCRDI*, 20 ERC 1753, 1758 (D.S.C.1984):

Under Section 107(a)(2) of CERCLA, 'any person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed of' and at which there has been a release or threatened release of hazardous substances, is liable for response costs incurred at the site. 42 U.S.C. § 9607(a)(2).

Groundwater contamination has been detected east of Route 125 and the origins of this pollution came from the KSD site, from the pre-IMC operations, from IMC and GLC operations. The EPA has incurred costs in inspecting and evaluating the disposal sites, determining the presence of groundwater, surface water and sediment contamination in monitoring the contamination, and finally conducting a remedial investigation and feasibility study.

Despite IMC's efforts to clean up the site in recent years and the fact that the buried drums were removed in good condition without leaks, there operation still contributed to the groundwater contamination and thus they fall under 42 U.S.C. § 9607(a)(2).

This is also true regarding GLC. They too, assisted in an extensive clean up, removing thousands of drums from the site. However, it is undisputed that GLC did contribute to extensive contamination of the soil and groundwater. The GLC sawdust pile area is still an active source of contamination. Based on these facts and others, this court finds the causal nexus required for liability under 42 U.S.C. § 9607(a)(2) is satisfied.

State Enforcement of N.H. RSA Ch. 147

■ The generator defendants argue that the New Hampshire Nuisance Statutes, N.H. RSA Ch. 147 (1977) are only to be enforced by Town health officials. They assert that the Attorney General has no authority to do so.

The Environmental Protection Division of the State of New Hampshire Attorney General's Office has the power to:

I. Enforce statutes pertaining to environmental protection, control, and preservation.

II. Counsel state agencies and commissions given the responsibility over environmental concerns including but not limited to the water supply and pollution control commission, the water resources board, the air pollution commission, and the pesticides control board.

III. Exercise the common law powers of the attorney general in protecting the environment.

IV. Bring public nuisance and other actions in superior court in the name of the state upon complaint by private citizens, when in the opinion of the attorney general the activity or activities complained of may have a substantial impact upon the environment of the state.

N.H. RSA § 7:18–b (Supp.1983). The Attorney General's office can, under N.H. RSA § 7:18–c, request and receive assistance from other state departments.

The town health officials receive their appointments by order of the Commissioner of Health and Welfare pursuant to N.H. RSA § 128:1 (1961). The duties of this position are to enforce the public health laws and regulations as may be required by the Division of Public Health Services. N.H. RSA § 128:5 (1977). Therefore, not only does the Attorney General have the power to enforce all laws necessary to protect the environment and public health, he also has the authority to order the Department of Health and Welfare to assist him in investigations. This assistance extends to all members of that department including the town health officials. Therefore, this court finds that the State through the Attorney General can enforce the provisions of N.H. RSA ch. 147.

■ The State of New Hampshire brought claims against defendants IMC and GLC asserting they are liable for a nuisance they created as owners and operators of the drum facilities at the Great Lakes site.

In *Robie v. Lillis*, 112 N.H. 492, 495, 299 A.2d 155 (1972), the New Hampshire Supreme Court defined a public nuisance as "behavior which unreasonably interferes with health, safety, peace, comfort or convenience of the general community." *Id.* The interference or harm complained of must be substantial. *Id.* Substantial harm means that harm which is in excess of the customary interferences a land user suffers in an organized society. The court recognized that there are unavoidable conflicts of individual interests and some annoyance, inconveniences and interference must be tolerated. *Id.* at 496, 299 A.2d 155. Liability arises "only in those cases where the harm or risk to one is greater than he ought to be required to bear under the circumstances." *Id.* (citation omitted). Generally, conduct will be unreasonable and liability imposed where the utility to the actor and the public is outweighed by the gravity of the harm that results. *Id.* (citation omitted).

In the present case, the evidence established that substantial harm to the public has resulted. The existence of the drum facility and its subsequent sub-par maintenance caused hazardous chemical contamination of the surrounding surface soil, subsoil and groundwater. The hazardous wastes released are undisputedly recognized as dangerous to the public's health and safety. Although IMC instituted a sincere clean-up of the site, there is evidence that groundwater contamination remains. Groundwater contamination and the harm that results certainly outweigh any economic benefit the defendants would gather from this operation.

An owner of the site or even a past owner like IMC cannot avoid its obligations by conveying the land. (For example IMC conveying to GLC). Liability will arise as stated under Restatement (Second) of Torts § 840A(1) (1979).

> A vendor or lessor of land upon which there is a condition involving a nuisance for which he would be subject to liability if he continued in possession remains subject to liability for the continuation of the nuisance after he transfers the land.

*Id.*

The courts in New Hampshire have enforced this principle in several cases. In *Eastman v. Amoskeag Manufacturing Co.*, 44 N.H. 143, 156 (1862) the court stated, "He who erects a nuisance does not by conveying the land to another transfer the liability for the erection to the grantee." *Id.* See also *Robertson v. Monroe*, 80 N.H. 258, 262, 116 A. 92 (1922) and other cases cited therein.

Defendants IMC and GLC may also be found liable for the existence of hazardous waste activities continuing on their property under common law nuisance "if they knew or *had reason to know* that a public nuisance existed...." *State v. Charpentier*, 126 N.H. 56, 62–63, 489 A.2d 594 (1985).

In *Charpentier*, the defendant allowed her son-in-law to occupy a house on her property. He initially used the site to excavate and sell gravel removed from the property. He also used it as a disposal site for refuse and demolition debris. *Id.* at 58, 489 A.2d 594. Later he disposed of hundreds of barrels of hazardous chemical waste on the property. *Id.* at 58–59, 489 A.2d 594. In fact, thousands of gallons of hazardous liquid waste were poured through a buried drain inside a commercial garage on the property. Despite her objections, the court found the defendant liable because she visited the site weekly and her son used half of the garage on a daily basis. *Id.* at 62–63, 489 A.2d 594.

In the case at hand both IMC and GLC did more than visit the hazardous waste site, they operated the site facilities. Both IMC and GLC had more than enough knowledge to know that a public nuisance existed. Furthermore, they also had control over the activities conducted on the property. Therefore, this court finds both IMC and GLC liable for the nuisance existing on the GLC site as a result of the many tons of hazardous waste found there.

### Defendant Generators' Estoppel Arguments

Defendant generators claim the State should be estopped by principles of equity from obtaining any relief from them. They argue that the conditions which developed at the Ottati & Goss site came about due to the State's acquiescence in defendants' activities and its mishandling of the conditions there. Defendants assert they relied on the State's involvement at the site and are no more negligent than the State.

The defendants rely on *City of Concord v. Tompkins*, 124 N.H. 463, 471 A.2d 1152 (1984) stating that the State should be estopped due to its own misconduct in this case. Citing the same case, this court points out that no defense has been made. According to *Tompkins*, the party asserting the estoppel bears the burden of proof. 124 N.H. at 467, 471 A.2d 1152. To meet this burden four elements must be satisfied. They are:

> First, a representation or concealment of material facts made with knowledge of those facts; second, the party to whom

the representation was made must have been ignorant of the truth of the matter; third, the representation must have been made with the intention of inducing the other party to rely upon it; and fourth, the other party must have been induced to rely upon the representation to his or her injury. *See id.* [*Town of Nottingham v. Lee Homes, Inc.*, 118 N.H. 438, 388 A.2d 940 (1978)]; *Olszak v. Peerless Ins. Co.*, 119 N.H. 686, 690, 406 A.2d 711, 714 (1979); *Monadnock School District v. Fitzwilliam*, 105 N.H. 487, 488–89, 491, 203 A.2d 46, 48, 49–50 (1964). *Tompkins*, 124 N.H. at 467–68, 471 A.2d 1152. Estoppel may apply to government actions, conduct or statements by its employees. However, these government employees must have had the authority to act and the above four elements must be satisfied. *Id.* at 468, 471 A.2d 1152.

The defendants have failed to present sufficient facts to meet the above standards. This court finds State involvement was minimal, and a State employee did tell some of the generator defendants to deal with Ottati & Goss at their own risk.

### State's Public Nuisance Claim and Independent Contractor, Vicarious Liability Claims

█ The State claims that the defendant generators are liable under common law for the nuisance existing at the Ottati & Goss site. The State seeks to hold them liable in negligence for the costs associated with the clean-up.

Specifically, the State seeks to hold the generators liable for negligently selecting an independent contractor to dispose of the waste. The State also alleges the generators are vicariously liable for the torts of its independent contractor where the act is one, which if not done properly, would result in injury.

The State claims the generators made minimal efforts to ascertain Louis Ottati's qualifications. Generators claim that those calling the State for information ascertained that no state laws prohibited his activities and his site was clean. The State also maintains that state officials did tell those who called to deal with Louis Ottati at their own risk.

Generally, the employer of an independent contractor is not liable for the negligence of the contractor. *Carr v. Merrimack Farmers Exchange, Inc.*, 101 N.H. 445, 448, 146 A.2d 276 (1958). There are some exceptions to this general rule, including:

'One who employs an independent contractor to do work which the employer should recognize as necessarily creating, during its progress, conditions containing an unreasonable risk of bodily harm to others unless special precautions are taken, is subject to liability for bodily harm caused to them by the absence of such precautions, if the employer (a) fails to provide in the contract that the contractor shall take such precautions ... or (b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions.'

*Id.* at 446, 146 A.2d 276 (quoting Restatement of Torts § 413 (1934).

In *Carr*, the plaintiff brought suit for injuries she received when a truck carrying defendant's hay bales and driven by an independent contractor dropped bales onto plaintiff's automobile. *Carr*, 101 N.H. at 446, 146 A.2d 276. The court found in this situation that where defendant knew the hay was dangerously and insecurely loaded, and could likely fall off the truck, creating an unreasonable risk of bodily harm to others, then it could be found negligent in not taking precautionary measures before the truck left the premises. *Id.* at 448, 146 A.2d 276. The court said:

'Though the act be not one necessarily resulting in injury but is one which, from its nature, will probably, unless precautions are taken, do injury to others, it is, by the weight of authority, the duty of every person who does it in person or causes it to be done by another to see to it that those precautions are taken, and he cannot escape this duty by turning the whole performance over to a contractor'.

*Id.* (quoting *Nashua Gummed & Coated Paper Co. v. Noyes Buick Co.*, 93 N.H. 348, 350, 41 A.2d 920 (1945)).

Finally, the court in *Carr* set out several factors to be considered in determining the employer's due care including:

> the magnitude of the danger involved if the undertaking should not be skillfully carried out; the reasonableness of the defendant's reliance upon the contractor in view of the nature of the undertaking and the competence of the contractor; the ease or difficulty with which the defendant could determine whether a risk to others was involved; and the existence of a relationship between the defendant and persons threatened with harm which would reasonably entitle them to expect the defendant to exercise care for their safety.

*Carr*, 101 N.H. at 450, 146 A.2d 276.

Applying the *Carr* factor to the present case it is evident that the degree of danger is very high if the disposal of hazardous waste is not skillfully managed. Defendants could easily determine that these hazardous substances involved a risk to others. The relationship between the defendants and persons threatened with harm, namely the people (State) of New Hampshire is indirect in that probably few people were aware of the defendants' activities, but potentially hundreds could be directly affected. Those living near the site would reasonably expect the defendant to exercise care for their safety. People residing near Route 125 would certainly expect the defendants to responsibly care for the area if some drums fell off a truck during transport and resulted in a spill. In a similar manner, those residing near the site and the generator-defendants would not expect the operators at the Ottati & Goss site to totally disregard any spills or leaks threatening public safety. Finally, the last factor concerns the reasonableness of the defendant's reliance upon the independent contractor—whether it was reasonable to rely on Ottati in view of the nature of the hazardous waste disposal and his experience.

The facts demonstrate that as of 1978 Louis Ottati had nine years of prior experience in this area. He had been employed at the KSD site since 1969.

The evidence shows that Floyd Jackson, a civil engineer with the Bureau of Solid Waste Management for the State of New Hampshire, first visited the Ottati & Goss site in early 1978. He testified, "The entire operation was clean with no indication or hint of law-breaking." (Exhibit # 51). Jackson made several visits to the site. He noted that the number of drums was increasing, but as of February, 1979 he never saw any violations. In July, 1979 he started to notice spills and ruptured drums.

Thomas Sweeney, Chief of Solid Wastes in New Hampshire testified that from March 1978 through the spring of 1979 he spoke with several of the generators who delivered to Ottati. He recalls that Lewis Chemical and General Electric (GE) made calls. GE specifically asked if the facility had the State's approval. They were told it did not and they dealt with Ottati at their own risk. Note, there were no hazardous waste statutes extant until July 1, 1979. By July, 1979 the Ottati site had gotten out of control. It appears that some of the generators did attempt to check out the Ottati & Goss operation. The ultra-hazardous nature of this activity, however, requires the defendants to do more; to be more circumspect and not leave it to chance. Unfortunately, the worst happened.

In *Carr*, the defendant was held liable because he did not take precautionary measures when he should have known and had reason to know that 13 tons of unsecurely stacked and tied hay bales on a flatbed truck were likely to cause harm. Likewise, the defendant-generators had reason to know and should have known that great danger awaited them in disposing of their hazardous waste at an unapproved site.

The generators did know the severe harm that could result from the improper handling of their waste and should have made every effort possible to secure a safe disposal process. There is no evidence that

the generators took *any* action to insure that their waste was processed properly. Evidence is lacking that the generators inspected the site, or requested that spills, leaks and spumescent pollutants be cleaned up as quickly and safely as possible. The evidence only indicates that the generators brought their hazardous waste in 55 gallon drums to the Ottati site and once out of sight they were forgotten.

The court in *Carr* stated that transporting baled hay is not an inherently dangerous activity but that transporting baled hay with the knowledge it is unsecurely loaded could create an unreasonable risk of injury. In the present case, it is very clear that both the generators and Ottati were dealing in an inherently dangerous activity when they engaged in the transport and processing of hazardous waste.

In *Wilson v. Nooter Corp.*, 499 F.2d 705, 707–08 (1st Cir.1974) the court discusses the application of the inherent-danger doctrine. This doctrine applies "only where the alleged danger was 'naturally to be apprehended' by the defendant at the time it arranged with an independent contractor to carry out the work." *Id.* at 707. This is an objective test; the determination of inherent danger should not be based on broad generalizations, but instead on the particular facts in each case. For example in *Carr*, carrying loads of hay bales is generally not inherently dangerous but, where the plaintiff alleged the shipper knew the load was insecurely affixed on the trailer there was a valid cause of action under this doctrine. A similar decision was reached in *Nashua Gummed & Coated Paper Co. v. Noyes Buick Co.*, 93 N.H. 348, 41 A.2d 920 (1945). In that case, the use of an acetylene torch in close proximity to highly flammable materials is inherently dangerous. *Id.* at 349–50, 41 A.2d 920.

In the case at hand, the nature of the chemical waste has been deemed hazardous as a matter of law. *See* 42 U.S.C. § 9601(14). The generators and Ottati & Goss each played a part in this inherently dangerous activity. The risk and consequences of these hazardous substances escaping into the environment is severe and in view of the fact that grave results did occur, these generator defendants are liable under common law nuisance.

The generators claim that they did not own or operate or occupy the Ottati & Goss site and thus N.H. RSA Chapter 147 (1977) does not apply to them. Under N.H. RSA § 147:13 abatement of a nuisance is required:

> If a person shall place, leave, or cause to be placed or left, ... on a private disposal site ... 'or shall allow to be exposed unburied' any ... substance liable to become putrid or offensive, or injurious to the public health ... shall be guilty of a violation, and the health officer shall remove or cause to have removed the same.

The enacting statutes, N.H. RSA § 147:1 and § 147:2 (1977) state that *any person* wilfully violating any rule or regulation shall be penalized. N.H. RSA § 147:3 (1977) empowers the health officers to "inquire into all nuisances and other causes of danger to the public health." The statute relied on by the defendants do not expressly exclude others from liability. Other statutes in this chapter apply generally to "person" or "persons", thus evidencing an intent to regulate more than owners and occupiers. *See* N.H. RSA §§ 147:13–15, 18, 19, 21, 21–a (1977). The generators do not eschew liability even if they are not owners or occupants of the site. The generators helped create the nuisance and remain liable until it is abated completely.

#### EPA's Nuisance Claim Against the Senter Defendants

In its first amended complaint the EPA, joined by the State of New Hampshire and the Town of Kingston, alleged common law nuisance against the Senter defendants. The allegations were that Senter Transportation Co., through its agent, Bernard R. Senter, knew or had reason to know that the activities were causing or involved an unreasonable risk of causing a nuisance and/or an endangerment to health and to the environment. The EPA claims these defendants consent-

ed to the activities at the Ottati & Goss site and failed to exercise reasonable care to prevent the nuisance. The EPA raises a similar claim against the Concord Realty Trust and its trustees, Bernard R. Senter and Sally Senter, who owned the land constituting the Ottati & Goss site.

In this case, the facts and law are clear that nuisance claims should be handled by state law. However, this court is not taking the position that federal courts are not empowered to make federal common law when dealing with the problems of hazardous waste and its relation to nuisance claims. *See United States v. A & F Materials Co., Inc.*, 578 F.Supp. 1249, 1255 (S.D. Ill.1984) (court recognized right of federal courts to implement and develop federal common law in area of hazardous waste cleanup).

In this case, the court rules that the United States District Court will defer to the common law of the State of New Hampshire which has already enunciated a pristine policy in the area of nuisance. Applying the law of New Hampshire to the facts of this case, this court finds that the Senter defendants are not liable for a public nuisance under common law.

Senter Transportation Co., Inc., Concord Realty, Bernard and Sally Senter, Trustees and Liability for Public Nuisance Under State Common Law

The State of New Hampshire seeks to hold the Senter defendants liable as landowners for the public nuisance created and existing on their property.

In the recent case of *State v. Charpentier*, 126 N.H. 56, 62–63, 489 A.2d 594 (1985), the court ruled that liability for common law nuisance may be established if the landowner knew or had reason to know that a public nuisance existed. The court based its ruling on the following principles:

A possessor of land upon which a third person carries on an activity that causes a nuisance is subject to liability for the nuisance if it is otherwise actionable, and

(a) the possessor knows or has reason to know that the activity is being carried on and that it is causing or will involve an unreasonable risk of causing the nuisance, and

(b) he consents to the activity or fails to exercise reasonable care to prevent the nuisance.

*Id.* (citing Restatement (Second) of Torts § 838 (1979)). *cited in Charpentier*, 126 N.H. at 60, 63, 489 A.2d 594.

In *Charpentier*, the court ruled that the jury could find the defendant liable even where no direct evidence was produced that she knew of the hazardous waste activities continuing on her property. The court found the defendant should have known that hazardous waste was being disposed of on her property. *Id.* at 63, 489 A.2d 594. The evidence was presented that she visited the house on the premises weekly. It was also shown that her son visited the premises daily while her son-in-law carried on the dumping activities. *Id.*

This court believes the present case regarding the Senter defendants can be distinguished from *Charpentier*. In the present action, Bernard Senter testified that he leased the land to Louis Ottati for the purpose of processing chemical waste. He testified that after entering into the lease with Louis Ottati in March, 1978 he visited the site very frequently, almost daily, until September, 1978.

He also testified that he never saw any broken drums or leaking or spillage. As far as he could ascertain the operation was a clean one and there was no reason for him to believe otherwise. There is evidence to support Senter's testimony. Floyd Jackson of the New Hampshire Bureau of Solid Waste Management testified that as of February, 1979 there were no violations at the Ottati & Goss site. In fact, it was not until July 1, 1979 that Jackson noticed spills from the drums. When Senter returned to the Ottati & Goss site in the spring of 1979 he saw that the conditions had changed dramatically. There were huge pyramids of haphazardly stacked drums. He also noticed leaks and spills. He tried to contact Ottati and Goss but apparently they had abandoned the site

and could not be found. In response to this information, he changed the lock on the main gate to prevent any further delivery of drums.

In the lease between Senter and Ottati & Goss, Ottati agreed not to discharge any materials on the ground. Ottati also agreed to indemnify Senter for any damages levied due to the hazardous waste operation occurring on the site. Senter instituted an action in Rockingham County Superior Court seeking an order to force Ottati & Goss to clean up the site. Such an order was given. The court ordered the removal of all waste materials and contaminated soil. Senter refused to extend the lease to Richard French until all the drums were removed and the site was cleaned.

The evidence presented indicates that from March, 1978 to May, 1979 there was no way Senter knew or should have known that a public nuisance existed at the Ottati & Goss site.

The court finds that the Senter defendants acted as reasonable prudent persons, not as persons involved in the unreasonable risk of causing the nuisance.

### Defendants' Liability Under N.H. RSA § 149:8(III)(a)

██ The State asserts that defendants IMC and GLC and the Senter landowners are liable for violating N.H. RSA § 149:8(III)(a) (1977) effective September 4, 1973, due to the activities and occurrences at their respective sites. The statute states:

It shall be unlawful for any person or persons to discharge or dispose of any sewage or waste to a surface water or ground water of the state without first obtaining a written permit from the commission. Applications for permits shall be made upon forms prescribed by the commission and shall contain such relevant information as the commission may require. The commission shall include in such permits effluent limitations, which may be based upon economic and technological factors, upon the classification enacted by the legislature, upon the projected best use of the surface waters

downstream or upon the requirements of the Federal Water Pollution Control Act as amended from time to time, and all regulations, guidelines and standards promulgated thereunder, whichever provides the most effective means to abate pollution.

Penalty provisions are extant under N.H. RSA § 149:19(I) (1977) which can punish "any person who shall willfully or negligently violate any provisions of this chapter...." The punishment can be a fine of not more than $25,000 for each day of violation or six months inprisonment, or both. N.H. RSA § 149:19 III.

The uncontroverted evidence shows that hazardous wastes were disposed of at the Ottati & Goss and the Great Lakes sites. Hazardous wastes were spilled, leaked, and were discharged onto the surface water and into the groundwater of both of these sites. Groundwater contamination has been confirmed at both sites and continues to exist. The defendants, IMC and GLC offered no evidence to demonstrate they complied with the statute; no permits were issued or even applied for.

The statute is clear on its face. The above defendants failed to comply with the statute and more than sufficient evidence shows they did discharge wastes into protected waters without a permit. Therefore, this court finds defendants IMC and GLC liable under N.H. RSA § 149:8(III)(a) for violations which occurred on their respective sites. However, as regards the Senter landowners this court stated earlier that the Senters did not authorize or participate in the discharge of hazardous waste materials. According to N.H. RSA § 149:1(VII) (1977) "person" is defined as "any municipality, governmental subdivision, public or private corporation, individual, partnership or other entity." N.H. RSA ch. 149 does not hold liable anyone except those "persons" who discharge materials into protected waters without a permit. There is no extension of liability to mere non-participatory landowners. Therefore, this court finds the Senter landowners did not violate N.H. RSA § 149:8(III)(a).

The statute is not to be considered retrospectively. Although the issue of damages has been curtailed until the liability phase of this trial has been resolved, the court due to the exigencies of time makes the following statement.

The plaintiff State of New Hampshire was aware and conversant with the activities at the Ottati & Goss site, the GLC site, and GLC's predecessors in title. Remedial action was never sought under the apposite provisions of N.H. RSA ch. 149 (1977). While not endorsing the activities, the evidence is that it practically condoned events there.

To allow the State of New Hampshire as late as July 24, 1980 to seek remedial action appears unconscionable.

In the event the court is unable to try the issue of damages, the future trier of facts should be explicitly aware of this judge's reasoning on this issue.

### Retrospective Application of N.H. RSA ch. 147–A

■ The State of New Hampshire seeks to hold all the defendants, except IMC, liable under the provisions of N.H. RSA § 147–A (Supp.1981), the Hazardous Waste Management statute (effective June 23, 1981 and amended in part August 16, 1983), formerly N.H. RSA §§ 147:48 to 57 (the Hazardous Waste Management Program effective July 1, 1979).

On July 1, 1979, the State of New Hampshire enacted its first hazardous waste management program. *See* 1979, N.H. Laws 347:2. This statute, codified at N.H. RSA § 147:48 *et seq.* (Supp.1979), was repealed in 1981 and was superseded by, and recodified as N.H. RSA ch. 147–A (Supp. 1981). *See* Laws 1981, ch. 413:2. The State seeks to impose liability on the defendants under N.H. RSA § 147–A:4, the imminent hazards provisions of N.H. RSA § 147–A:13 and the strict liability provisions of N.H. RSA § 147–A:9.

The defendants argue that to apply N.H. RSA ch. 147 *et seq.* to this case would be unconstitutional because its retroactive application would be in violation of Part I,

Article 23 of the New Hampshire Constitution which states:

> Retrospective laws are highly injurious, oppressive and unjust. No such laws, therefore, should be made, either for the decision of civil causes, or the punishment of offenses.

N.H. Const. art. 23, pt. I.

It is well established that the retrospective application of new laws is a serious problem.

> It is a fundamental principle of jurisprudence that retroactive application of new laws involves a high risk of being unfair. There is general consensus among all people that notice or warning of the rules that are to be applied to determine their affairs should be given in advance of the actions whose effects are to be judged by them. The hackneyed maxim that everyone is held to know the law, itself a principle of dubious wisdom, nevertheless presupposes that the law is at least susceptible of being known. But this is not possible as to law which has not yet been made.

2 Sutherland, Statutory Construction § 41.-02 (4th ed. C. Sands 1973). New Hampshire is not alone in its avoidance of retrospective application of new laws. There are several states who include similar prohibitions in their constitutions. They are Colorado, Georgia, Idaho, Missouri, Ohio, Tennessee and Texas. *See Cummings v. Bostwick*, 481 F.Supp. 1251, 1254 n. 6 (D.N. H.1980).

Just recently the New Hampshire Supreme Court reaffirmed the long standing principle against retrospective laws, in *Norton v. Patten*, 125 N.H. 413, 415, 480 A.2d 190 (1984). In *Norton* the court recalled the definition of a retrospective law as applied to civil statutes, and as set forth in *Woart v. Winnick*, 3 N.H. 473, 479 (1826). *Norton*, 125 N.H. at 415, 480 A.2d 190. The court in *Woart* stated that

> every statute which takes away or impairs vested rights, acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or

considerations already past, must be deemed retrospective. *Id.* (quoting *Society v. Wheeler,* 22 F.Cas. 756, 767 (C.C.D. N.H.1814) (No. 13, 156)); *see, Geldhof v. Penwood Associates,* 119 N.H. 754, 755, 407 A.2d 822, 823 (1979).

*Norton,* 125 N.H. at 415, 480 A.2d 190 (quoting *Woart,* 3 N.H. at 479).

In *Norton* the court stated that a retrospective statute does not violate Article 23 of the New Hampshire constitution, "if it affects the remedy only and is not oppressive or unjust." *Norton,* 125 N.H. at 416, 480 A.2d 190. The court noted that the legislative intent was clear and, more importantly, no substantive right was altered. Contrary to *Norton,* the retroactive application of N.H. RSA ch. 147–A to the defendants affects not only a remedy but alters their substantive rights. If N.H. RSA ch. 147–A is allowed to apply to activities that occurred prior to July 1, 1979 then these defendants may all be held liable under the strict liability provisions of N.H. RSA § 147–A:9. If liability is established then criminal penalties and fines may be assessed under N.H. RSA § 147–A:16. This statute states:

I. Any person shall be guilty of a class B felony if a natural person, or guilty of a felony if any other person who knowingly:

(a) Violates any provision of RSA 147–A or any rule adopted by the bureau relative to RSA 147–A;

(b) Violates any term or condition of a permit or an order issued under RSA 147–A;

(c) Makes or certifies a material false statement relative to any document required by RSA 147–A; or

(d) Tampers with a monitoring device or fails to comply with a monitoring method required under RSA 147–A.

II. Notwithstanding RSA 651:2, a natural person may, in addition to any sentence of imprisonment, probation or conditional discharge, be fined not more than $50,000 if found guilty of any violation of RSA 147–A:16 I. Each day of

violation shall constitute a separate offense.

III. Notwithstanding RSA 106–B:15, police employees of the division of state police are authorized to serve criminal process and make arrests for violations of this chapter and any rules adopted under this chapter.

N.H. RSA § 147–A:16.

In addition to criminal penalties any violator of chapter 147–A may suffer civil forfeiture under N.H. RSA § 147–A:17. This statute states:

I. Any person shall be subject to a civil forfeiture of up to $50,000 for each day of a continuing violation, in addition to enforcement by injunctive relief, who violates:

(a) Any provision of RSA 147–A or any rule adopted by the bureau relative to RSA 147–A; or

(b) Any term or condition or a permit or an order issued under RSA 147–A.

II. Civil forfeitures levied under RSA 147–A:17, I shall be paid to the New Hampshire hazardous waste fund established under RSA 147–B.

III. In addition to any civil forfeiture imposed under RSA 147–A:17, I, any person who violates or causes or suffers a violation of RSA 147–A:17, I shall be strictly liable without regard to fault for costs directly or indirectly resulting from the violation relating to:

(a) Containment of hazardous wastes;

(b) Necessary cleanup and restoration of the site and the surrounding environment; and

(c) Removal of the hazardous wastes.

N.H. RSA § 147–A:17.

The State seeks to hold the defendants liable for actions taken in violation of a hazardous waste management statute when no such law existed at the time the activities occurred. The liability created in N.H. RSA ch. 147–A did not exist prior to July 1, 1979. Absent a legislative intent to the contrary, courts will not retrospectively apply statutes affecting substantive rights. *LeBarre v. Daneault,* 123 N.H. 267, 271, 461 A.2d 89 (1983). Furthermore, a viola-

tion of any provision of N.H. RSA ch. 147–A clearly affects substantive rights and to allow the State to impose the harsh penalties listed above is oppressive and unjust.

This court notes that N.H. RSA § 147:48 outlines in a footnote the findings and purpose of the hazardous waste management program and there is no reference whatsoever to a retrospective application. There is no mention of solving past pollution problems but rather it espouses a future oriented purpose.

N.H. RSA § 147–B:1, effective June 23, 1981 states that its purpose is to clean up hazardous waste and materials that have been improperly discharged, disposed of or spilled. N.H. RSA § 147–B:10 (Supp.1981) calls for strict liability and authorizes liens upon business revenues and real and personal property of those who cause expenditures from the fund. The strict liability provisions will apply to those people who directly or indirectly cause the spending of the fund to contain, clean up, or remove hazardous waste from past and present sites. N.H. RSA ch. 147–B (Supp.1981) and was not alleged in the complaint by the State and does not apply in this case.

The first hazardous waste management program in New Hampshire, N.H. RSA ch. 147:48–:57 was enacted on July 1, 1979. Prior to that date, there were no hazardous waste statutes or procedures. *See Stablex Corp. v. Town of Hooksett,* 122 N.H. 1091, 1097, 456 A.2d 94 (1982). The evidence presented in the present case shows that most of the hazardous waste disposal activities took place prior to July 1, 1979. For example, the following defendants made the following deposits at the Ottati & Goss site:

| | |
|---|---|
| K.J. Quinn & Co., Inc. | January, 1979—April, 1979 |
| General Electric | March, 1978—April, 1979 |
| Lilly Industrial Coatings, Inc. | May, 1978—January, 1979 |
| Solvents Recovery Service, Inc. | March, 1978—May, 1978 |
| GLC | March, 1978—May, 1978 |
| IMC | Did not dispose of any material at Ottati & Goss |
| Lewis Chemical | February 2, 1979—July, 1979 |

In regard to the GLC site, IMC purchased the site in 1973 and was found not liable for the activities from 1955–73. The parties have stipulated that IMC has no liability at all for the Ottati & Goss site. The evidence also shows IMC sold the GLC site to GLC in August, 1976. Only GLC deposited hazardous waste at the GLC site and this continued until 1980.

The above evidence demonstrates that only Lewis Chemical and GLC operated in the hazardous waste disposal industry after July 1, 1979.

N.H. RSA ch. 147–A and its predecessor N.H. RSA § 147:48–57 create new obligations, impose new duties and attach new disabilities. During the time before July 1, 1979 there was no state regulation of hazardous waste disposal. No permits were required (except N.H. RSA 149 controlling discharges into surface waters). The State was aware of the activities taking place at both sites. There is evidence that the state employees visited the Ottati & Goss sites and found it a rather clean site prior to July, 1979. The evidence also proves that up to that time, the State found no indication or hint of law breaking. This court finds that to allow the State to enforce N.H. RSA ch. 147–A and its predecessor to the activities occurring before July 1, 1979 without any evidence of legislative intent to do so, is to apply a new law retrospectively in violation of the New Hampshire Constitution. This statute does not apply to any defendants who did not dispose of hazardous chemical waste prior to July 1, 1979. Therefore, this court finds that N.H. RSA ch. 147–A can only be constitutionally applied to defendants Lewis Chemical and GLC.

### N.H. RSA Ch. 147–A And the Senter Defendants

The State also alleges that the Senter defendants including Senter Transportation, Inc., Concord Realty Trust and Ber-

nard and Sally Senter, trustees are liable under the strict liability provisions of N.H. RSA § 147–A:9 (Supp.1981). This statute reads: "I. Any operator, generator, or transporter who causes or suffers the treatment, storage, transportation or disposal of hazardous waste in violation of RSA 147–A...." Under N.H. RSA § 147–A:2 (Supp.1981) an "operator" is one "who owns or operates a hazardous waste treatment, storage or disposal facility."

The above-named Senter defendants directly or indirectly own the Ottati & Goss site. Senter Transportation, Inc. sold the site and assigned its interest in the lease to Concord Realty Trust by June 29, 1979. Therefore, N.H. RSA ch. 147–A does not apply to this particular defendant. However, Concord Realty Trust, and its trustees, Bernard and Sally Senter owned the Ottati & Goss site after July 1, 1979 and therefore, as operators, they are liable under N.H. RSA ch. 147–A. There is no retrospective application of a new statute problem concerning these specific defendants.

### Town of Kingston's Claims

The Town of Kingston (hereinafter Kingston) moved for leave to intervene as plaintiff on October 20, 1980. The motion was granted on November 25, 1980. On the same day Kingston filed its original complaint in intervention seeking similar relief under RCRA § 7003 and the Clean Water Act, 33 U.S.C. § 1365 as sought by the EPA and State of New Hampshire. Kingston also seeks to enjoin the defendants under Section 6.17 and 7.40 of the town's Zoning and Building Code. Additionally, Kingston alleged nuisance claims pursuant to N.H. RSA §§ 147:3, 4 and 7 (1977). Finally, Kingston seeks litigation and attorneys fees.

On January 9, 1981 Kingston's motion to amend was granted. Following the EPA and the State, Kingston filed an amended complaint alleging common law nuisance against the Senters.

On January 26, 1983 the EPA and the State filed a second amended complaint. Kingston did not move to amend their first amended complaint at this time. However, on April 23, 1985 Kingston filed a motion for a second amended complaint in intervention. During the closing arguments of this case on June 12, 1985 this court permitted discussion and rebuttal on this motion. The motion was denied June 14, 1985. As a result, any pleadings made by Kingston must originate from their first amended complaint and any references to the EPA's and State's claims can only come from their first, and not from their second amended complaints.

Kingston has no claims against the generator defendants, also known as General Electric, Lewis Chemical, Lilly, and Quinn & Co. Kingston does not have any claims under CERCLA §§ 106 and 107(a). Kingston cannot join the State's claims under N.H. RSA § 147–A against the generators, and IMC and GLC.

Kingston's claims for relief are limited to enforcement of RCRA § 7003 against the original Ottati & Goss defendants and GLC. They may pursue those claims under the Clean Water Act, 33 U.S.C. § 1365, as well as the New Hampshire Water Pollution Control Act N.H. RSA 149:8 III(a) and common law nuisance. Specifically, the Ottati & Goss defendants are alleged to have violated N.H. RSA § 147:3, 4 and 7, by creating a public nuisance. GLC was charged with similar violations at the GLC site.

Pursuant to 42 U.S.C. § 6973 and 33 U.S.C. § 1365(b)(1)(B) Kingston may intervene as of right to seek relief to remedy imminent and substantial endangerment to health and environment due to storage and disposal of hazardous waste at the Ottati & Goss and GLC sites.

This court has already found that Bernard Senter and Concord Realty Trust are liable under § 7003. The court ruled that the Senters, as prior owners of the Ottati & Goss site may be held liable for the RCRA violations found on it. *See United States v. Price*, 523 F.Supp. 1055 (D.N.J.1981). In light of the evidence presented and the

ability to intervene, the above defendants are also liable to Kingston.

GLC has been found liable for violating N.H. RSA § 149:8(III)(a) (1977). The evidence clearly illustrates that this defendant discharged and disposed of hazardous waste into both surface water and groundwater causing contamination. This defendant also failed to apply for and obtain a written permit before discharging hazardous waste into the State's water systems. Kingston can seek relief from this defendant by joining with the State in this action. The control and elimination of water pollution is clearly within the scope of the police power of the State. *Shirley v. New Hampshire Water Pollution Commission*, 100 N.H. 294, 299, 124 A.2d 189 (1956) (citations omitted).

The N.H. RSA ch. 147 nuisance claims concerning GLC regarding its activities at the GLC site have already been determined. Liability was decided on the facts that GLC operated the site facilities, had more than sufficient knowledge that a public nuisance existed, and finally that they had control over the property. As a result of the many tons of hazardous waste found there, Kingston may also seek relief from GLC for its activities on the GLC site. Therefore, this court finds that GLC is liable to the Town of Kingston for the public nuisance it created on the GLC site.

Note that this court has previously deemed this trial to be bifurcated and as such it will not address any claims for reimbursement of costs at this time.

The claims against Richard French and French Processing have already been determined. Richard French defaulted and the court has found him liable.

Louis Ottati, Sr., Wellington Goss and Ottati & Goss, Inc., are liable for the public nuisance created by the storage and disposal of hazardous waste at the Ottati & Goss site. The evidence shows that approximately 6,900 drums of waste were sent to this site between May, 1978 and May, 1979. The drum processing backlogged and spills and leaks were common. Letters were sent to Ottati & Goss, French and Senter ordering them to remove contaminated soil by August 5, 1979. They did not remove any soil. As the owners, prior owners and operators of the Ottati & Goss site, these defendants, excluding the Senters, had knowledge of the hazardous waste activities and in some cases, had direct control of the activities. Therefore, this court finds, based on the law of *State v. Charpentier*, 126 N.H. 56, 489 A.2d 594 (1985), that the above defendants, excluding the Senter landowners are liable to the Town of Kingston under N.H. RSA ch. 147.

Kingston's final claims concern the Town's own discoveries. Kingston seeks to enjoin the defendants from violating §§ 6.17, Article VII, § 7.20 and Article VII § 7.40. of the Zoning and Building Code of the Town of Kingston, New Hampshire (adopted March 14, 1978). They also seek to enjoin defendants from violating the Gravel Pit Ordinance of the Town of Kingston (as adopted March 10, 1976 and subsequently amended).

Article VI, § 6.17 deals with subsurface waste water disposal, including septic tanks, cesspools, privies or sewers. Article VII, § 7.20 provides that pits for the removal and sale of sand, gravel, stone or earth can only be opened and operated with the specific approval of the Board of Selectmen. Article V § 7.40 states "industrial development must have prior approval of the Town after being recommended by the Selectmen." The Gravel Pit Ordinance establishes a plan whereby one seeking to remove gravel or other similar materials must seek a permit from the Selectmen, meet the excavation specifications and post a cash bond. Kingston seeks to impose the penalty provisions on the defendants for violating the above listed sections.

The equitable relief sought by Kingston for the defendants' alleged violations of the above provisions cannot be granted because the actions that require restraint no longer exist.

The evidence previously presented in this case shows that the Ottati & Goss defendants and GLC have stored and disposed of

hazardous wastes at the respective sites in the Town of Kingston. The testimony of Bernard Senter discloses that approval was given by the Town of Kingston prior to the removal of gravel from a fourteen acre parcel, part of which is the Ottati & Goss site. Senter testified that the Concord Realty Trust, of which he is a trustee, applied for and received a permit to excavate gravel from this site. This permit was, as he put it, subsequently "taken away by the EPA when they closed the land." Testimony of Bernard Senter, transcript # 625, at 71–72, April 12, 1984, Trial Day 43. Senter also stated that following the EPA's actions Concord Realty Trust no longer had authority to remove gravel from the site.

Considering the evidence, this court finds a lack of zoning ordinance violations by the Senter-defendants. However, this court does find that Ottati & Goss, Inc., Louis Ottati and Wellington Goss are liable under Article VI. § 6.17 and Article VII 7.40. No evidence has been brought forth that these two defendants complied with § 6.17 or § 7.40.

This court has previously found GLC liable under § 309 of the Water Act. This finding was based on the evidence that waste materials discharged by GLC were found in South Brook and in other navigable waters. The evidence shows no NPDES permit ever was issued by the State to GLC or its predecessors in title at the GLC site. The Town of Kingston by intervening under 33 U.S.C. § 1365(b)(1)(B) seeks similar relief. The discharges flowed into water sources in the Town of Kingston and the ensuing damage occurred in Kingston. Therefore, this court finds that the discharge on December 1, 1982 violates Section 301(a) of the Water Act and as such GLC is liable to the Town of Kingston.